UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| ABSORPTION PHARMACEUTICALS, LLC, | Case No. 2:17-CV-513 JCM (NJK) |
|---|---|
| Plaintiff(s), | ORDER |
| v. | |
| RECKITT BENCKISER, LLC, | |
| Defendant(s). | |

Presently before the court is defendant Reckitt Benckiser's motion to dismiss or, in the alternative, transfer venue. (ECF No. 6). Plaintiff Absorption Pharmaceuticals, LLC filed a response (ECF No. 16), to which defendant replied (ECF No. 17).

Also before the court is plaintiff's motion to take jurisdictional discovery. (ECF No. 27). Defendant filed a response (ECF No. 28), to which plaintiff replied (ECF No. 30).

**I.    Facts**

*a. Promescent*

Plaintiff manufacturers and sells Promescent, an over-the-counter lidocaine spray that functions to desensitize male genitalia. (ECF No. 1 at 4). Plaintiff's primary target consumer base is males who suffer from premature ejaculation ("PE"),[1] and the company's stated goal is to "close the 'arousal gap' between men and women." *Id.*

Plaintiff began selling Promescent in 2011 and alleges a successful launch due to an "innovative proprietary formula and unique marketing strategies." *Id.* By 2012, larger companies began to notice plaintiff's success. *Id.* Auxilium Pharmaceuticals, Inc. ("Auxilium"), a

---

[1] Plaintiff also targets "recreational users," men that do not experience PE but nonetheless want to delay arousal. (ECF No. 1 at 6).

**James C. Mahan**
**U.S. District Judge**

pharmaceutical manufacturer who was since purchased by Endo International plc (ECF No. 6 at 19), approached plaintiff regarding a possible acquisition. (ECF No. 1 at 4). Plaintiff alleges that on January 27, 2013, Auxilium offered to acquire plaintiff in a deal consisting of an upfront cash payment, sales milestone earn-outs, and future royalties, which plaintiff valued at over $150 million. *Id.* Plaintiff declined the offer and decided to remain independent for the time being.

In 2014, plaintiff hoped to expand its operation, and began seeking out a "corporate partner with a large global presence." *Id.* Plaintiff alleges that Auxilium, who was still interested in an acquisition, re-affirmed its prior offer. *Id.* In addition, defendant approached plaintiff to discuss a potential acquisition. *Id.*

### b. *Initial discussions regarding a potential acquisition*

Plaintiff alleges that in March of 2014, defendant acquired the K-Y Brand from Johnson & Johnson. *Id.* at 8. Thereafter, defendant hired Stephen De Pretre as an acquisition consultant. *Id.* De Pretre suggested to defendant that plaintiff was a promising acquisition target. *Id.* In May of 2014, Corrie Mueller, then marketing manager for Durex (one of defendant's brand labels), ordered eight bottles of Promescent to defendant's affiliate in Beijing, China. *Id.*

Later that month, Mueller set up a telephone conference between Reckitt Benckiser Household Products (China) Co. Ltd. (defendant's Chinese affiliate, hereinafter "RBHP") and plaintiff. *Id.* Mueller generated talking points for the meeting, including plaintiff's "financial overview, supply and distribution chain details, and marketing overview." *Id.* The parties executed a "Mutual Confidentiality Agreement" to facilitate the exchange of information and the protection of the parties. *Id.* Plaintiff proposed an agreement, and RBHP responded by including two terms: an English choice of law provision and a permissive arbitration clause providing for the possibility of arbitration in London. *Id.*

On June 4, 2014, in New York City, plaintiff's chief executive officer ("CEO") met with Volker Sydow, Reckitt Benckiser global category director for sexual wellness products. *Id.* at 9. Sydow expressed initial reservations regarding the effectiveness of a lidocaine-based PE spray and the size of the potential market. *Id.* Plaintiff alleges that its CEO was able to overcome Sydow's concerns, and that Sydow left the meeting impressed by the potential of plaintiff's product. *Id.*

Sydow scheduled a meeting between plaintiff's CEO and Mueller for the next day. *Id.* The meeting between plaintiff's CEO and Mueller took place in Las Vegas, Nevada. *Id.*

    *c. Due diligence*

On June 25, 2014, plaintiff and defendant participated in a "kick-off" telephone conference, during which defendant sent plaintiff 60+ due diligence questions regarding 15 topics, including plaintiff's "business and market, finance and accounting, intellectual property, regulatory, information technology, supply, market research and consumer, technology, and marketing and communication." *Id.* at 10. Plaintiff claims that it initially expressed reservations about disclosing proprietary information to defendant, but that assurances from two of defendant's directors encouraged plaintiff to begin its disclosures. *Id.*

On June 30, 2014, plaintiff's CEO expressed concern regarding the lack of a term sheet, and stated that plaintiff was anticipating beginning due diligence with another company soon. *Id.* at 11. Defendant's senior vice president of corporate development wrote to plaintiff's CEO, highlighting the strength of defendant's brands and global presence. *Id.* The senior vice president encouraged plaintiff to "bear with us and continue to help us in our due diligence effort." *Id.* Plaintiff responded by continuing to disclose its proprietary information to defendant. *Id.* at 11–12.

De Pretre, who had been employed by defendant, began working for plaintiff. *Id.* at 12. In meetings with De Pretre, Sydow showed him tests defendant conducted regarding Promescent, including tests on human cadavers that would monitor the degree of absorption. *Id.* De Pretre in turn divulged to Sydow proprietary information regarding Promescent. *Id.*

Throughout the due diligence process, plaintiff's CEO had numerous conversations with Sydow. *Id.* During these conversations, plaintiff's CEO would explain plaintiff's business and marketing strategies. *Id.* Sydow told plaintiff's CEO about defendant's power over certain retailers. Plaintiff alleges that Sydow stated that Reckitt Benckiser's market power was so strong that it could induce retailers–including Target–to take shelf space away from other companies' products to immediately make room for Reckitt Benckiser's products. *Id.* Plaintiff also alleges

that Sydow stated that Reckitt Benckiser has significant influence over Amazon.com. *See id.* ("Amazon does not tell us what to do, we tell Amazon what to do.").

Plaintiff alleges that it complained to defendant about the lack of a formal offer. *Id.* After one such complaint, Sydow informed plaintiff's CEO that an offer was sitting on the desk of the CEO for Reckitt Benckiser and waiting for a signature. *Id.*

During the due diligence process, defendant asked plaintiff to send 15 kilograms of bulk product for "condom testing." *Id.* at 13. Plaintiff alleges that such quantity is far in excess of anything that defendant would need to perform such testing, although plaintiff did not know as much at the time of the request. *Id.*

### d. The market study, stalled negotiations, and defendant's assurances

On August 18, 2014, plaintiff's CEO met with Alexander Lacik, CEO of defendant's North American operations, in Parsippany, New Jersey. *Id.* at 13. The two discussed plaintiff's customers and customer retention. *Id.* Plaintiff's CEO showed Lacik Promescent.com's "transactional portal," which contained plaintiff's order history and trends. *Id.*

After the meeting between Lacik and plaintiff's CEO, defendant told plaintiff it wanted to conduct an outside market study to confirm the size of the market prior to finalizing a formal offer. *Id.* Defendant also mentioned concerns regarding potential regulatory issues surrounding Promescent. *Id.* Plaintiff's CEO asked Sydow to provide plaintiff with a copy of the study. *Id.* Sydow responded that he would be willing to do so and anticipated that he could provide plaintiff with a copy. *Id.*

Defendant concluded its market study, and Sydow told plaintiff's CEO that the market projection was much smaller than had been initially anticipated. *Id.* at 14. On January 28, 2015, plaintiff's CEO called Sydow and accused defendant of creating its own PE spray. *Id.* at 15. Plaintiff alleges that Sydow assured plaintiff's CEO that defendant was not attempting to duplicate Promescent. *Id.* For the next few months, plaintiff's CEO asked Sydow to share the results of the market study. *Id.* Changing course, Sydow now claimed that the results were "confidential." *Id.* Defendant never shared the results of its market study with plaintiff. *Id.*

In April of 2015, a third party informed plaintiff that defendant planned to launch a lidocaine-based PE spray. *Id.* at 16. Plaintiff's CEO called Sydow, who again gave assurances that defendant was not introducing its own PE spray. *Id.* Plaintiff and defendant ceased active communications for the next six months. *Id.*

In December of 2015, defendant expressed renewed interest in acquiring plaintiff, and defendant sought to obtain updated information regarding plaintiff's sales, customers, and any new technological developments. *Id.* In early 2016, the parties began negotiating a non-disclosure agreement. *Id.* The parties could not come to terms as to a non-disclosure agreement, and plaintiff ceased communications with defendant regarding a potential acquisition. *Id.*

Plaintiff alleges that between February and May 2016, defendant's research and development department ordered approximately 70 bottles of Promescent. *Id.* In order to prevent arousing plaintiff's suspicion, defendant had the bottles shipped to the home address of defendant's research and development director and used a personal credit card to complete the transactions. *Id.*

e. *Duration*

In June of 2016, defendant began production of its own line of lidocaine spray intended to desensitize male genitalia. *Id.* at 17. On September 1, 2016, defendant launched its product, named Duration. *Id.* Plaintiff alleges that defendant invested between $40 and $50 million in marketing of its product, which plaintiff alleges projects an initial market of $500 million dollars.[2] *Id.*

Plaintiff alleges that defendant's product is "strikingly similar" to Promescent: defendant's product packaging uses a very similar color scheme to Promescent bottles; defendant's marketing campaign, like Promescent's campaign, targets both therapeutic and recreational users; defendant's product, like Promescent, is offered in trial size and standard size bottles; and defendant's product sells at nearly identical price points to Promescent. *Id.* at 17–18.

---

[2] This is the same initial estimate plaintiff's CEO communicated to defendant during the due diligence process.

*f. Business interactions with Target and Amazon*

Plaintiff alleges that defendant interfered with its relationship with Target. Around March of 2016, plaintiff entered into an agreement with Target Corporation to stock Promescent on shelves in 1,600 stores beginning in October of 2016. *Id.* at 18. The agreement contemplated four stock-keeping units (or "SKUs")—two small and two large bottles. *Id.* Under the agreement, plaintiff had to create Target-specific packaging and commit to a large advertising campaign. *Id.* Thereafter, plaintiff invested $400,000 on Target-specific packaging and committed to a $2 million advertising campaign. *Id.*

In July of 2016, Target informed plaintiff that, due to new product launches in the same category as Promescent, Target could not promise that shelf space would still be available in October. *Id.* at 18. Further discussions "culminated in an email from Target in August 2016 stating that it would not launch Promescent in its stores in October." *Id.* at 18–19. Plaintiff's CEO met with Target's executive buying team, and asked whether defendant caused Target to divert shelf space away from Promescent and to Duration. *Id.* at 19. Plaintiff alleges that Target did not deny that defendant caused the diversion. *Id.* As a result of the meeting, Target agreed to carry one trial size SKU of Promescent in its retail stores. *Id.* Target currently carries and has shelf space for 4 SKU's of Duration. *Id.*

Plaintiff also alleges that defendant interfered with plaintiff's relationship with Amazon. *Id.* Plaintiff alleges that shortly before Duration launched, Amazon moved Promescent from the general merchandise section of its website to the "adult section." *Id.* Plaintiff states that in order to access the adult section of Amazon, a user must click a button authorizing the query to return search results within the "adult" products section. *Id.* at 20.

Upon its release, Duration was placed in the general merchandise section of the website. *Id.* Plaintiff asserts that it would often call Amazon to complain about the unequal treatment of its product. *Id.* "On several occasions, low level Amazon customer service representatives moved Duration to the 'adult section' when [plaintiff] complained. However, each time, Duration was moved back to a standard category in short order . . . ." *Id.* Amazon has since returned Promescent to the general merchandise category. *Id.*

James C. Mahan
U.S. District Judge

Plaintiff also alleges that defendant purchased the federally registered trademark "Promescent" as a keyword to advertise Duration. *Id.* This causes Duration advertisements to appear on the Amazon.com purchase screen for Promescent, and denies Promescent the ability to advertise on Amazon.com using the Promescent trademark. *Id.*

   *g. Other relevant background*

On October 8, 2016, plaintiff registered in Nevada as a foreign limited-liability company. (ECF No. 6-6). Prior to its registration in Nevada, plaintiff had identified the location of its principal office as Huntington Beach, California. *Id.* On January 21, 2017, plaintiff initiated the instant lawsuit. (ECF No. 1).

**II.   Legal Standard**

"The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Similarly, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a).

**III.  Discussion**

Defendant's motion asks this court to (1) dismiss plaintiff's complaint for lack of personal jurisdiction; (2) in the alternative, dismiss plaintiff's claims of fraud, intentional interference with contractual relationships, and intentional interference with a prospective economic advantage for failure to state a claim, or (3) in the alternative, transfer venue to the District of New Jersey. (ECF No. 6). As the court holds that venue is proper in the District of New Jersey and transfer to that district is in the interest of justice, the court will not discuss defendant's first two arguments.

Defendant asserts that even if this court possesses jurisdiction to hear the instant dispute, the case should be transferred to the District of New Jersey. (ECF No. 6 at 17). Defendant states that the case could have been brought in the District of New Jersey and that the balance of convenience factors favors transfer. *Id.*

A district court's decision on whether to transfer a case requires the court to conduct a case specific "consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). A district court has broad discretion when determining whether to transfer venue pursuant to § 1404(a). *Id.* "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

In considering a motion to transfer venue under § 1404(a), the court may weigh a number of factors, including:

> (1) the location where the relevant agreements were negotiated and executed; (2) the state that is most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) the contacts relating to the plaintiff's cause of action in the chosen forum; (6) the differences in the costs of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; and, (8) the ease of access to sources of proof.

*Jones*, 211 F.3d at 498–99. When considering these factors, courts employ a balancing approach, and no single factor is dispositive. *See Lens.com, Inc. v. 1-800 CONTACTS, Inc.*, 2:11-cv-0091-GMN-RJJ, 2012 WL 1155470, at *6 (D. Nev. Apr. 4, 2012).

"A plaintiff's choice of forum is normally only given substantial deference if the plaintiff is a resident of the district in which the action is brought." *Miracle Blade, LLC v. Ebrands Commerce Group, LLC*, 207 F. Supp. 2d 1136, 1156 (D. Nev. 2002). Otherwise, plaintiff's choice of forum bears little significance in determining whether to grant a discretionary transfer. *See, e.g., Collins v. JC Penney Life Ins. Co.*, Case No. C 01-4069-SI, 2002 WL 505931, *3 (N.D. Cal. 2002).

As an initial matter, defendant is correct in asserting that the case could have been brought in the District of New Jersey and is therefore eligible for transfer. *See* 28 U.S.C. 1404(a). The court will therefore consider the other factors outlined in Section 1404(a).

Defendant argues that transfer is appropriate for four reasons: the convenience of the parties and the costs of litigation; the ability to compel attendance of unwilling non-party witnesses; the respective parties' lack of contact with Nevada; and the lack of deference due here to plaintiff's forum choice. Plaintiff responds that all of the *Jones* factors are either neutral or favor maintaining venue in the District of Nevada.

**James C. Mahan**
**U.S. District Judge**

As to the third fourth *Jones* factors, the parties have ties to the state of Nevada and plaintiff's choice of forum is entitled to deference. Plaintiff's CEO and majority member, who resides and works in Nevada, was the point of contact for defendant during the negotiations and due diligence phases of defendant's failed acquisition of plaintiff. Defendant knew that plaintiff's CEO was communicating with defendant primarily from Nevada, and even coordinated a meeting with plaintiff in Las Vegas. Defendant and plaintiff regularly advertise and sell their products within the state of Nevada. These are contacts with the forum state that relate to plaintiff's causes of action.[3] Therefore, the plaintiff's choice of forum here is entitled to deference.

Further, the second *Jones* factor (the state that is most familiar with the governing law) weighs against transfer. Plaintiff alleges federal as well as state causes of action under Nevada law. Nevada courts are more familiar with Nevada law than out of state courts. *See Operation Heroes, Ltd. V. Procter and Gamble Productions, Inc.*, 903 F. Supp. 2d 1106 (D. Nev. 2012) ("Nevada courts are more familiar with Nevada law than are [foreign] courts.").

However, even assuming plaintiff's choice of forum is entitled to deference, and a Nevada court would be better situated to apply Nevada law to the instant case, a venue transfer is appropriate, as four of the other *Jones* factors weigh heavily in favor of transferring the case to the District of New Jersey.

First, the costs of litigation and the convenience of witnesses weigh in favor of transfer. As defendant's motion notes, many of its potential witnesses live in New Jersey (where it is headquartered) and Pennsylvania (where Auxilium, which is now a part of Endo International, plc, is headquartered), and some of its potential witnesses live abroad. New Jersey would be a preferred venue for many of these parties.

---

[3] In this case, unlike all of the cases cited in defendant's brief, the plaintiff's choice of forum has meaningful connections to the controversy. *See Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 955 ("In this case no contacts of any substance with the State of Hawaii existed as to either party."); *Miracle Blade*, 207 F. Supp. 2d at 1156 (holding that plaintiff's choice of forum was entitled to minimal deference when plaintiff was a California resident and filed a lawsuit in Nevada); *Nat'l Fitness Co., Inc. v. Procore Laboratories, LLC*, Case No. 2:10-cv-02168-JCM-RJJ, 2011 WL 2463296, at *2–3 (D. Nev. June 20, 2011) (holding that where a defendant seller was supposed to perform all of its obligations under a contract in Texas, venue was not proper in Nevada even if plaintiff buyer was a Nevada resident).

**James C. Mahan**
**U.S. District Judge**

Second, the availability of compulsory process to compel attendance of unwilling non-party witnesses also favors transfer.[4] In this portion on their brief, defendant stresses the importance of the testimony of Auxilium witnesses to its defense of plaintiff's claims. (ECF No. 6). These non-party witnesses are located in Malvern, Pennsylvania, which is within 100 miles of the courthouses in the District of New Jersey, but well outside of the scope of compulsory process for this court.

Third, the contacts relating to plaintiff's causes of action are far more prevalent in New Jersey than in Nevada. Most all of defendant's alleged conduct in this case occurred outside of the state of Nevada. Save one in-person meeting between plaintiff's CEO and Mueller, defendant conducted almost all of its negotiations with plaintiff from locations on the east coast, including its headquarters in Parsippany, New Jersey. The majority (99%) of defendant's sales are out-of-state. Therefore, the fifth *Jones* factor favors transfer.

Fourth, the location of relevant evidence exists almost entirely outside plaintiff's chosen forum, and much of it exists in the movant's proposed forum. As the previous paragraph notes, much all of the relevant evidence is located on the east coast (mostly in Parsippany, New Jersey). The ease of access to sources of proof is far greater in the movant's proposed forum than in the current forum, which favors transfer. *See Jones,* 211 F.3d at 498–99.

The remaining *Jones* factor is neutral. Plaintiff asserts that the location where the relevant agreements were negotiated and executed is either neutral or favors maintaining the action in Nevada, as plaintiff's contractual relationship with Amazon is governed in part by an agreement with Amazon Services LLC, a Nevada LLC. (ECF No. 16 at 23). The alleged circumstances surrounding the execution of plaintiff's contract with Amazon Services LLC appears to have minimal importance to the instant litigation, which focuses primarily on defendant's alleged conduct of misappropriating plaintiff's trade secrets and interfering with plaintiff's contracts and economic advantages.

---

[4] Defendant's arguments here overlap somewhat with its arguments regarding the costs of litigation and convenience of witnesses.

Having considered plaintiffs' complaint and the parties' filings, the court finds it appropriate to exercise its discretion and transfer venue in the instant case. On balance, the factors listed in *Jones* favor litigating this case in New Jersey. Defendant's arguments are sufficiently compelling to warrant transfer of this action to the District of New Jersey. *See Decker*, 805 F.2d at 843. Given this holding, the court will not address defendant's additional arguments.

**IV.     Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant's motion to dismiss, or, in the alternative, transfer venue, (ECF No. 6) be, and the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.

IT IS FURTHER ORDERED that defendant Reckitt Benckiser will prepare an appropriate order transferring venue to the U.S. District Court for the District of New Jersey, and submit the same to the court for signature.

IT IS FURTHER ORDERED that plaintiff's motion to take jurisdictional discovery (ECF No. 27) be, and the same hereby is, DENIED as moot.

DATED December 1, 2017.

_____
UNITED STATES DISTRICT JUDGE