### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ABSORPTION PHARMACEUTICALS, LLC,**<br><br>*Plaintiff,*<br>v.<br>**RECKITT BENCKISER LLC,**<br><br>*Defendant.* | **Civil Action No. 17-12872**<br><br>**OPINION** |

ARLEO, UNITED STATES DISTRICT JUDGE

     **THIS MATTER** comes before the Court on Defendant Reckitt Benckiser LLC's ("Defendant" or "RB") Motion for Summary Judgment against Plaintiff Absorption Pharmaceuticals, LLC ("Plaintiff" or "Absorption"), pursuant to Federal Rule of Civil Procedure 56. ECF No. 210. Plaintiff opposes the Motion. ECF No. 217. For the reasons set forth herein, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

I.   BACKGROUND[1]

     This action arises from failed negotiations between the parties over Absorption's premature ejaculation ("PE") product, Promescent, a lidocaine spray that functions to desensitize male genitalia. Def. SOMF ¶¶ 2-3. Absorption owns the exclusive rights to Promescent's formula, which it produces and sells over-the-counter to consumers. See id. ¶¶ 2-3, 19. RB is a global leader in sexual wellness products. Id. ¶¶ 5.

---

[1] Unless otherwise indicated, the Court draws the following facts from Defendant's Statement of Material Facts ("Def. SOMF"), ECF No. 212, Plaintiff's Supplemental Statement of Material Facts ("Pl. Supp. SOMF"), ECF No. 217.2, that are not in dispute, and the parties' responses to those submissions, see ECF No. 217.1 ("Pl. Response to Def. SOMF"); ECF No. 220.1 (Def. Response to Pl. Supp. SOMF").

### A.     Absorption's Early Acquisition Discussions with Auxilium

In late 2012, Absorption began discussing a potential acquisition with Auxilium, Pharmaceuticals, Inc. ("Auxilium"), a pharmaceutical company that sold, among other things, men's health and erectile dysfunction drugs.  See id. ¶¶ 34, 38, 43-44, 53.  On or about January 24, 2013, Absorption received an email from Auxilium with "an idea around the acquisition scenario," which contained two spreadsheets with detailed potential payments to Promescent shareholders based on certain sales assumptions and a 5% royalty rate.  Id. ¶¶ 43-44.  After presenting Auxilium's proposal to "the board and a few major stockholders," Absorption advised Auxilium that the acquisition proposal was "not something [it] would entertain" and turned it down.  Id. ¶¶ 51-52.

### B.     RB's and Absorption's Negotiations Over Promescent

Around the same time Absorption turned down Auxilium's initial proposal, RB hired Sapphire Group Asia Pacific Ltd. ("Sapphire"), a third-party consulting firm, to identify products that RB could acquire or license under its "Durex" brand.  Id. ¶ 65.  Sapphire presented Promescent as an "opportunity" to RB and facilitated an initial conference call between RB and Absorption, on or about May 26, 2014.  Id. ¶¶ 68, 73, 79.  That same day, Absorption and Reckitt Benckiser Household Products (China) Co. Ltd. ("RB China") entered into a Mutual Confidentiality Agreement (the "MCA") pursuant to which the parties agreed to not disclose confidential information, including trade secrets and other items defined by the agreement.  Id. ¶¶ 74-77; Def. Ex. 40, ECF No. 214.39 (the MCA).

On June 5, 2014, Jeff Abraham ("Abraham"), Absorption's CEO, and Volker Sydow ("Sydow"), RB's then-Global Category Director for Sexual Wellbeing, met in New York to discuss Promescent.  Def. SOMF. ¶ 80.  There, Abraham told Sydow about Promescent's

substantial repeat customer business and allowed him to view Absorption's "cart," a database containing information on sales of Absorption products to consumers.  See Def. SOMF ¶¶ 80-81; Pl. Supp. SOMF ¶ 8-9.[2]  The following day, Abraham met with Corrine Mueller, an RB China representative, in Las Vegas, Nevada, and claims he showed her Absorption's cart.  Def. SOMF ¶¶ 84, 86; Def. Ex. 4, Deposition of Jeffrey A. Abraham ("Abraham Dep.") at 102:10-103:4, 150:21-151:22, ECF No. 214.3.  RB thereafter organized a due diligence team to evaluate Promescent as an "acquisition opportunity" for RB.  Def. SOMF ¶ 88; Def. Ex. 45, ECF No. 214.44.  On June 25, 2014, Sydow emailed Abraham a list of due diligence topics, which included a series of questions about Absorption's organizational structure, intellectual property rights, Food and Drug Administration ("FDA") regulatory compliance, and Promescent sales information.  Def. SOMF ¶ 89; Def. Ex. 45, ECF No. 214.44.  To aid RB's diligence process, Absorption sent RB customer purchase history information on more than one occasion, see Def. SOMF ¶¶ 90-91; Def. Exs. 46-47, and Abraham claims he sent Sydow all information on Promescent's repeat customers, see Pl. Ex. 66, Deposition of Jeffrey A. Abraham ("Abraham Dep. II") at 132:3-17, ECF No. 219.4

By June 26, 2014, at least one senior RB executive sampled Promescent, and Sydow notified Abraham that they "think it is fantastic."  Pl. Supp. SOMF ¶ 3; see also Pl. Ex. 107, ECF No. 219.7.  In early July, Abraham inquired about RB's valuation of Absorption and the timeframe for how the parties' dealings would proceed.  See Def. SOMF ¶ 92; Def. Ex. 49.  On July 9, RB sent Absorption a letter from its Corporate Development team, expressing "RB's strong interest in pursuing a transaction with A[bsorption]."  Def. Ex. 53 (the "July 2014 RB Letter"), ECF No. 214.52; see Def. SOMF ¶ 94.  RB also asked Absorption to "bear with [it] and continue to help [it] in [its] due diligence efforts," July 2014 RB Letter, and indicated that it "hope[d] to be in a position

---

[2] The parties dispute the precise data contained in Absorption's cart but agree that Sydow viewed some level of customer purchase information.  See Def. SOMF ¶¶ 81-82; Pl. Supp. SOMF ¶¶ 8-10.

to formalize a proposal to [Absorption] within 30 days."  July 2014 RB Letter; Def. SOMF ¶ 95.

RB and Absorption continued discussing a potential deal after RB sent the July 2014 RB Letter.

Def. SOMF ¶ 96.

RB did not present Absorption a proposal within thirty days of the July 2014 RB Letter, but the parties continued engaging with each other.[3]  On August 18, 2014, Abraham met Alexander Lacik ("Lacik"), RB's then-President of North America Operations, in New Jersey.  Def. SOMF ¶ 85.  Abraham claims that he showed Lacik Absorption's cart, id. ¶ 86; Abraham Dep. at 102:10 -103:4, 157:12-158:5, and that Lacik told him to not "do anything except wait.  [RB would] get this done, and RB is the right choice for you," Pl. Supp. SOMF ¶ 68.  Around that time, RB and Absorption discussed whether RB would provide Absorption a "term sheet" for a deal between the parties.  See Def. SOMF ¶¶ 97-98; Pl. SOMF ¶¶ 64; Def. Exs. 43, 52, 57, ECF Nos. 214.42, 214.51, 214.56.  Ultimately, RB neither provided a term sheet nor conveyed the terms of any proposal in writing to Absorption.[4]  Def. SOMF ¶¶ 100, 139.

In September 2014, Sydow and Abraham discussed the final hurdles to clear before the parties reached a deal, and Sydow assured Abraham the transaction was moving forward.  Pl. Supp. SOMF ¶¶ 69, 71.  Abraham claims that in November, Lacik told him to "hang in there" as RB "was going to make this happen."  Id. ¶ 74.  Absorption continued providing Promescent data to

---

[3] The parties dispute RB's motivation for providing the July 2014 RB Letter.  Absorption claims that it was intended to give Abraham "hope" that it was "working toward something," see Pl. Supp. SOMF ¶ 65, while RB maintains that its due diligence with Absorption was ongoing, and while it could not provide Absorption an offer at that time, RB communicated its "strong interest in pursuing a transaction with AP," Def. Response to Pl. Supp. SOMF ¶ 65.

[4] The parties agree that RB did not provide a term sheet to Absorption but dispute RB's motivation for its decision not to do so and disagree on the structure of the prospective deal.  See Def. SOMF ¶¶ 97-98, 100; Pl. Response to Def. SOMF ¶¶ 97-98, 100.  The draft term sheet submitted by RB anticipates a transaction wherein Absorption grants RB an "exclusive license . . . to develop, make, have made, use, sell, offer for sale, import and otherwise exploit" Promescent.  Def. SOMF ¶ 98; Def. Ex. 59, ECF No. 215.  Absorption claims it anticipated an acquisition by RB.  See Plaintiff's Response to Def. SOMF ¶¶ 98-99, ECF No. 217.1; Deposition of Catherine Lawton ("Lawton Dep.") at 243:16-244:17, Pl. Ex. 72, ECF No. 219.5.  On at least one occasion, RB emailed Absorption that it was "assess[ing] Promescent as an acquisition opportunity for RB."  Def. Ex. 45, ECF No. 214.44.

RB.[5]  Id. ¶ 75.  It was unaware, at that point, that RB had been considering developing its own PE product.  See id. ¶ 70.

In the meantime, while conducting due diligence between June and October 2014, RB identified a potential regulatory issue with Promescent.  See Def. SOMF ¶ 102.  In particular, RB engaged consultants to assess the risk Promescent would be susceptible to an FDA challenge, in part, because it included the ingredient thymol.  See id. ¶¶ 103-06.  At least one consultant determined that the risk associated with FDA compliance enforcement action was low, see id. ¶ 106, while another found that Promescent was not FDA compliant, see Def. Ex. 71, ECF No. 215.12.  By the end of 2014, Absorption was aware that RB had identified this issue.  See, e.g., Abraham Dep. II at 185:4-25.  Absorption explored the possibility of an alternative formulation for Promescent and engaged an investment bank to focus on Promescent's safety profile.  See Def. SOMF. ¶¶ 108-09; Def. Ex. 77, ECF No. 215.18.

On or about January 21, 2015, RB held a decision-making meeting to determine whether to continue discussions with Absorption.  Def. SOMF ¶ 112.  At the meeting, three options were presented to RB related to entering the PE product market: (1) pursue a transaction with Absorption despite the potential regulatory risks; (2) pursue a transaction involving "Stud100," a third-party company's PE product that apparently did not have similar regulatory risks; or (3) develop and launch RB's own FDA-complaint product.  Id. ¶ 113; see also Def. Ex. 21 at RB0120100, ECF No. 214.20.  RB decided to terminate discussions with Absorption.  Id. ¶ 114.[6]

---

[5] RB asserts that the information Absorption provided was not in response to "any due diligence from RB," but does not dispute that Absorption continued to provide it information.  Def. Response to Pl. Supp. SOMF ¶ 75.

[6] Absorption disputes RB's claim that it decided not to pursue Promescent because of potential regulatory issues but does not dispute that RB terminated the parties' discussions.  See Pl. Response to Def. SOMF ¶ 114; Pl. SOMF ¶ 21; Def. Ex. 31, ECF No. 214.30.

### C.      RB's Creation of K-Y Duration

While conducting due diligence into Promescent, RB also assessed the viability of developing its own PE product.  See Def. SOMF ¶ 147; Def. Ex. 21, ECF No. 214.20; Pl. Ex. 43, ECF No. 219.3; Pl. Ex. 44, ECF No. 219.3; Pl. Ex. 52, ECF No. 219.3.  In December 2014, Nielsen, a third-party engaged by RB, conducted three separate concept tests to evaluate the potential market for an over-the-counter PE product.  Def. SOMF ¶ 147.  In March 2015, after terminating discussions with Absorption, RB internally shared a document entitled "Promescent data – confidential," which apparently contained a "summary chart of Promescent."  See Pl. Supp. SOMF ¶ 22; Pl. Ex. 64, ECF No. 219.4.  The parties dispute whether the document contained confidential data belonging to Absorption.  See Def. Response to Pl. Supp. SOMF ¶¶ 23-24.  Absorption claims that RB continued to use its confidential information without authorization to develop and launch its own PE product.  Pl. Supp. SOMF ¶¶ 25-30.  RB contends that it never actually used Absorption's confidential information and disputes whether much of that cited by Absorption was publicly available.  Def. Response to Pl. Supp. SOMF ¶¶ 25-30.

In June 2015, RB increased development of its own FDA-compliant PE product, called "K-Y Duration."  See Def. SOMF ¶¶ 140-41.  RB developed K-Y Duration's formula by reverse engineering Stud100, which does not include thymol.  Id. ¶¶ 142-46.  As part of its K-Y Duration development, RB conducted various studies and evaluations to assess the regulatory risks, absorption properties, safety, and stability of the product.  Id. ¶ 153.  One of those studies involved the absorption properties of several PE products, including K-Y Duration, Stud100, and Promescent.  Id. ¶ 154.  RB also engaged a consultant to test consumer perceptions of various packaging designs and a marketing firm to design and implement its marketing campaign.  Id. ¶¶ 152, 156.

On October 12, 2015, Abraham received an email from Stephen De Prete, Absorption's then-Vice President of International Sales and Distribution, indicating that RB confirmed to him that it was "going to launch a monograph compliant PE spray in the US." Id. ¶ 162.  In early 2016, Absorption and RB re-engaged in discussions about a possible transaction, and Absorption requested the parties enter into a new confidentiality agreement.  Id. ¶¶ 167-69; Def. Exs. 115-16, ECF Nos. 215.56-.57.  Because the parties could not agree to terms of the new agreement, Absorption terminated those discussions.  Def. SOMF ¶ 170.  RB launched K-Y Duration later that year, in September 2016.  Id. ¶ 8.

### D.      The Parties' PE Products on Amazon and Target

In early 2016, Absorption and RB separately approached Target regarding launching their products.  Id. ¶ 265.  On March 25, 2016, Abraham met with Target representatives, Pl. Supp. SOMF ¶ 48, and on or about April 4, 2016, Absorption and Target entered a Partners Online Agreement, Def. SOMF ¶ 274.  Absorption thereafter began developing and manufacturing a Target-specific product that met Target's size and marketing requirements.  See Pl. Supp. SOMF ¶ 50.  Absorption claims that Target initially agreed to carry four facings of Promescent in its stores—two trial-sized and two standard-sized products—but RB disputes this fact.  See Pl. Supp. SOMF ¶¶ 49, 59; Def. Response to Pl. Supp. SOMF ¶¶ 49, 59.  On August 11, 2016, Target agreed to carry Promescent's trial size product only.  Def. SOMF ¶ 271; Pl. Supp. SOMF ¶ 59.

At the same time Absorption and Target negotiated over Promescent, Target engaged in negotiations with RB over K-Y Duration.  See generally Pl. Supp. SOMF ¶ 53, 60.  In April 2016, Target and RB discussed RB's competition in the PE market, including Promescent, which Target claimed "appear[ed] to have superior technology to Duration."  Id. ¶ 53.  RB advised Target that it wanted four facings of K-Y Duration's standard-sized product in stores, and ultimately Target

agreed.  See Def. SOMF ¶ 269.  As a result, RB launched K-Y Duration with four product facings in some Target stores.  See Pl. Supp. SOMF ¶ 61.

In August 2016, RB met with Amazon to discuss K-Y Duration's launch on Amazon's website.  See id. ¶ 42.  Amazon agreed to use K-Y Duration in a test to determine whether it could exempt male desensitizing products from its policies on adult products beginning the following month.  See Def. SOMF ¶¶ 245, 248.  During the test, Amazon did not restrict K-Y Duration from view on its website.  See id. ¶ 250.  Although Absorption began selling Promescent on Amazon in 2015, Promescent was not initially a part of that test, and Amazon instead flagged it as an adult product restricted from view for approximately one month, coinciding with the timing of K-Y Duration's launch.  See id. ¶ 251; Pl. Response to Def. SOMF ¶ 261; Pl. Supp. SOMF ¶ 47. Absorption claims that RB had a former employee, who later worked at Amazon, flag Promescent as an "adult" product.  Pl. Supp. SOMF ¶ 40.  Eventually, Amazon removed the "adult flag" from Promescent.  Def. SOMF ¶ 262.

### E.    Procedural History

On February 21, 2017, Absorption filed the Complaint against RB in the United States District Court for the District of Nevada.  ECF No. 1.  On March 15, 2017, RB filed a motion to dismiss, or, alternatively, a motion to transfer venue.  ECF No. 6.  The United States District Court for the District of Nevada granted RB's transfer motion on December 1, 2017 and transferred the action to this Court on December 7, 2017.  ECF Nos. 33, 37.

Absorption brings the following claims against RB: (1) common law fraud ("Count One"); (2) federal trade secret misappropriation in violation of the Defend Trade Secrets Act ("DTSA") 18 U.S.C. §§ 1836, 1839 ("Count Two"); (3) trade secret misappropriation under Nevada law ("Count Three"); (4) intentional interference with contract ("Count Four"); and (5) tortious

8

interference with prospective economic advantage ("Count Five").  Compl. ¶¶ 90-133, ECF No. 1.

RB filed its Answer to Absorption's Complaint, which included counterclaims, on April 16, 2019.  ECF No. 154.  On May 7, 2019, Absorption filed its Answer to RB's counterclaims. ECF No. 165.  On October 9, 2019, RB filed the instant motion for summary judgment, ECF Nos. 210-16, which Absorption opposed, ECF Nos. 217-19.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), the Court should grant summary judgment when there is no genuine issue as to any material fact "'that would permit a reasonable jury to find for the nonmoving party,'" Boyle v. Cty. of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citation omitted), and "the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the Court does not "weigh the evidence to determine the truth of the matter," but rather assesses "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986).

The Court construes all facts and inferences in the light most favorable to the non-moving party, see Boyle, 139 F.3d at 393, and the moving party bears the initial burden of demonstrating that no genuine issue of material fact remains, see Celotex Corp., 477 U.S. at 322-23.  If the moving party meets its burden, the non-moving party must present evidence demonstrating a genuine issue of material fact for trial.  See Anderson, 477 U.S. at 248-49.  A non-moving party's "[u]nsupported allegations, subjective beliefs, or argument" cannot alone overcome a properly supported summary judgment motion.  V.C. by Costello v. Target Corp., 2020 WL 1864611, at *4 (D.N.J. Apr. 14,

2020).  If the non-moving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" summary judgment is warranted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 59 n.5 (3d Cir. 1992) (internal quotation marks and citation omitted).

## III.   ANALYSIS

### A.   Choice of Law

Because Absorption originally filed this action in the District of Nevada, as a preliminary matter, the Court must determine which law applies to Absorption's claims.  "[W]hen a civil action is transferred from one district court to another pursuant to § 1404(a) on a motion of the defendant, the transferee forum must apply the law of the initial forum."  Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 171 (3d Cir. 2011) (citing Van Dusen v. Barrack, 376 U.S. 612, 639 (1964)); see also Lafferty v. St. Riel, 495 F.3d 72, 76-77 (3d Cir. 2007).  That means the Court must apply Nevada choice of law rules to determine which state's law governs this case.

RB argues that Nevada's "most significant relationship test" dictates that New Jersey law applies here, Def. Br. at 16-18, ECF No. 211, while Absorption asserts that summary judgment is inappropriate under either state's law and "reserves all rights regarding choice of law," Pl. Br. at 12 n.8, ECF No. 217.  The Court agrees with RB.

Nevada courts apply a four-prong "most significant relationship test" to tort actions. Vignola v. Gilman, 854 F. Supp. 2d 883, 886 (D. Nev. 2012).  Under that test, courts consider: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil, residence, nationality, place of incorporation, and place of business of

the parties"; and (4) "the place where the relationship, if any, between the parties is centered." Id. (quoting Restatement (Second) of Conflict of Laws § 145 (1971)).  For trade secret cases, "the most important factor . . . is the location of the wrongdoing, not the place of injury."  Glob. Advanced Metals USA, Inc. v. Kemet Blue Powder Corp., No. 11-793, 2013 WL 1110778, at *2 (D. Nev. Mar. 11, 2013).

Here, the first, second, and third factors weigh in favor of applying New Jersey law.  In transferring the action to this Court, the District of Nevada observed that "[m]ost of all [RB's] conduct in this case occurred outside of the state of Nevada" and RB "conducted almost all of its negotiations with [Absorption] from locations on the east coast, including its headquarters in Parsippany, New Jersey," where most of the evidence is located.  ECF No. 33 at 10.  While Abraham lives in Nevada and at least one meeting between Absorption and RB occurred in Nevada, see Def. SOMF ¶¶ 84, 86; Abraham Dep. at 102:10-103:4, 150:21-151:22; ECF No. 214.3, it does not appear from the record that Nevada has any other contacts relevant to this case. The Court is thus satisfied that New Jersey law governs Absorption's common law tort claims.

Having found the appropriate governing law, the Court now considers whether Absorption's claims survive summary judgment.

### B.     Fraud (Count One)

RB argues that the Court should grant summary judgment on Count One because: (1) it is premised on RB's failure to disclose, which is not actionable absent a duty to disclose; (2) any alleged misrepresentations relate to future predictions and promises; and (3) Absorption cannot demonstrate that it justifiably relied on any alleged misrepresentations.  Def. Br. at 20-24; Def. Reply at 6-10.  The Court disagrees.

To prove fraud in New Jersey, a plaintiff must demonstrate, by clear and convincing, evidence: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other party rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Oshri v. PNC Bank, No. 17-11594, 2020 WL 1527953, at *3 (D.N.J. Mar. 31, 2020) (citations omitted).  Omissions of material fact, like misrepresentations, may constitute fraud under certain circumstances where a duty to disclose exists. Maertin v. Armstrong World Indus., Inc., 241 F. Supp. 2d 434, 461 (D.N.J. 2002) ("The deliberate suppression of a material fact is equivalent to a material misrepresentation if the party has a duty to disclose the fact.").  A duty of disclosure may arise where such "disclosure is necessary to make a previous statement true." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993); see also Ponzio v. Mercedes-Benz USA, LLC, No. 18-12544, 2020 WL 1183733, at *24 (D.N.J. Mar. 11, 2020).

Business negotiations may fall into the "make a previous statement true" category where one party makes disclosures on a subject during negotiations on which the other may reasonably rely or is "affirmatively misled." See Maertin, 241 F. Supp. 2d at 461.  In those cases, the party who volunteered the information "has the duty to clarify the matter and ensure it is truthful." Id. (citing Strawn v. Canuso, 271 N.J. Super. 88, 104 (App. Div. 1994)); see also Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets, Inc., No. 11-5550, 2012 WL 13034154, at *5 (D.N.J. July 12, 2012) ("[T]he Third Circuit has made clear that under New Jersey law there is a duty to disclose when such disclosure is necessary to make a previous statement true or not misleading.").

Here, Absorption's fraud claim is premised on both RB's affirmative misrepresentations and omissions in affirmatively misleading Absorption about its intent to engage in a business

transaction.  See Pl. Br. at 22, 27.  Absorption asserts RB misled it to "secure its continued cooperation" so that RB could develop K-Y Duration, while Absorption justifiably relied on RB's misrepresentations that "a deal was imminent" in providing its trade secrets to RB.  Id. at 26-28.

The Court finds a genuine issue of material fact exists as to each element of Absorption's fraud claim based on both theories of misrepresentations and a duty to disclose.  There is record evidence demonstrating RB's assurances that a deal was forthcoming were material misrepresentations.  For example, Absorption points to the July 2014 RB Letter, wherein RB expressed its "strong interest in pursuing a transaction" with Absorption and that it was "working towards putting together a robust, well thought-through proposal," which it "hope[d] . . . to formalize . . . within 30 days." July 2014 RB Letter.  Absorption cites to contemporaneous internal emails and documents of RB on which a reasonable juror could find that, despite its representations about timely providing a term sheet and that any delays were due to its ongoing Promescent due diligence, RB had in fact decided to withhold an offer while it investigated its own product development route.  See, e.g., Pl. Exs. 35-36, ECF No. 219.2; Pl. Ex. 43 at 6556; Pl. Ex. 73 at 216:9 to 217:13, ECF No. 219.5 (discussing the three phrases of K-Y Duration's "concept testing"); Pl. Ex. 89, ECF No. 219.6.  Abraham testified to several alleged misrepresentations RB made during this time about an impending offer, while Absorption continued to provide its trade secret and other confidential information to RB.  See, e.g., Abraham Dep. II at 183:15 to 184:2, 271:2-14, 272:6-273:8.

RB argues that some of its representations comprised future predictions and promises or puffery, which are not actionable as misrepresentations.  See Suarez v. Eastern Int'l College, 428 N.J. Super. 10, 29 (App. Div. 2012) ("[N]either expressions of opinion, nor 'puffery,' will satisfy the [material misrepresentation] element of fraud.") (internal citations omitted).  In

particular, RB claims that its expression of interest in pursuing a transaction with Absorption is not actionable.  See Def. Br. at 23.  To the contrary, "[c]ourts in this district have held the exact opposite to be true."  Lee v. A to Z Trading LLC, No. 12-4624, 2018 WL 2980390, at *8 (D.N.J. June 13, 2018).  "[W]here a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud."  Lo Bosco v. Kure Eng'g. Ltd., 891 F. Supp. 1020, 1031 (D.N.J. 1995).  Viewing the evidence in Absorption's favor, there is a triable issue as to whether RB made material misrepresentations and had a duty to correct previous statements about its intent to enter a deal with Absorption.

There are also triable issues of fact on reliance and damages.  There is a material issue of fact as to whether Absorption relied on RB's misrepresentations by continuing to cooperate and by disclosing its trade secrets and confidential information to RB.  There is also a fact issue as to whether Absorption suffered harm from relying on RB's misrepresentations or omissions.  RB's motion for summary judgment on Count One is thus denied.

### C.    Misappropriation of Trade Secrets (Counts Two and Three)

RB makes several arguments as to why the Court should grant summary judgment in its favor on Counts Two and Four.  First, RB argues that Absorption's DTSA claim in Count Two fails as a matter of law because it developed K-Y Duration in 2015 and early 2016, and the DTSA, which became effective on May 11, 2016, does not apply retroactively.  Def. Br. at 29.  Second, RB contends that the economic loss doctrine bars Absorption's trade secret misappropriation claims as those claims arise exclusively from RB's alleged violation of the MCA.  Id. at 30. Finally, RB asserts that Absorption has failed to identify the trade secrets RB allegedly

14

misappropriated, and even so, there is no evidence in the record that RB misappropriated Absorption's trade secrets. Id. at 31-40. The Court addresses each of these arguments in turn.

### i.   Whether the DTSA Applies to Count Two

RB argues for summary judgment on Count Two because Absorption's claims pre-date the DTSA's enactment. Absorption does not dispute that the alleged acquisition of its trade secrets occurred before the DTSA's effective date. Absorption instead presents a "continued use" theory of trade secret misappropriation: the DTSA applies because RB continued to use Absorption's trade secrets, including its pricing and marketing strategies, that it "obtained under the guise of a potential acquisition" to launch K-Y Duration in September 2016. Pl. Br. at 11. The Court agrees with Absorption.

The DTSA creates a private right of action for the misappropriation of trade secrets. 18 U.S.C. § 1836(b)(1). The statute "by its own terms, applies only to an act of misappropriation that occurs 'on or after'" May 11, 2016, the date of its enactment. Quintiles IMS Inc. v. Veeva Sys., Inc., No. 17-177, 2017 WL 4842377, at *4 (D.N.J. Oct. 26, 2017) (quoting Hydrogen Master Rights, Ltd. v. Weston, 228 F. Supp. 3d 320, 338 (D. Del. 2017)). However, Third Circuit courts have interpreted the DTSA to apply to misappropriations occurring before the statute's enactment where a plaintiff alleges "pre-enactment acquisition of a trade secret coupled with post-enactment continued use." Marimar Textiles, Inc. v. Jude Clothing & Accessories Corp., No. 17-2900, 2017 WL 4391748, at *6 (D.N.J. Oct. 2, 2017) (collecting cases); see also Teva Pharma. USA, Inc. v. Sandhu, 291 F. Supp. 3d 659, 674-75 (E.D. Pa. 2018) ("Misappropriation, as defined in the DTSA, includes unauthorized 'use,' not just acquisition of a trade secret. Thus, one who acquired and used a trade secret before enactment of the DTSA and continued to use it after enactment is liable.") (internal citations omitted). Several of our sister jurisdictions have similarly applied this

rule to assess the viability of post-enactment DTSA claims.  See, e.g., Camick v. Holladay, 758 F. App'x 640, 645 (10th Cir. 2018); Iacovacci v. Brevet Holdings, LLC, ___ F. Supp. 3d ___, 2020 WL 528059, at *9 (S.D.N.Y. 2020); Yeiser Research & Dev. LLC v. Teknor Apex Co., 281 F. Supp. 3d 1021, 1057 (S.D. Cal. 2017); Veronica Foods Co. v. Ecklin, No. 16-7223, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017).

Case law on the requirements for sustaining a DTSA claim for continued use is emerging and relatively sparse, especially at the summary judgment stage.  Courts agree that "conclusory allegations of continuing use and disclosure are insufficient" to withstand a motion to dismiss. Hydrogen Master Rights, 228 F. Supp. 3d at 338; see also Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp., No. 16-2499, 2017 WL 1105648, at *4 n.8 (E.D. Pa. Mar. 24, 2017) (observing that plaintiff's continued use allegations were "factually specific" as they "contain[ed] details regarding who continued to use the trade secrets, what the trade secrets were, and under what circumstances they [were] continuing to be used").  At least one court assessing this issue in evaluating a summary judgment motion found a triable issue of fact as to whether the defendant continued to use the plaintiff's trade secrets after the DTSA's effective date where the plaintiff "put forward evidence of at least one instance" of the defendant's post-enactment use.  Sonoma Pharma., Inc. v. Collidion, Inc., No. 17-1459, 2018 WL 3398940, at *5 (N.D. Cal. June 1, 2018).

Here, the Court is satisfied that Absorption has identified evidence in the record on which a reasonably jury could find RB continued to use its trade secrets after May 11, 2016.  For example, Absorption highlights an email dated June 21, 2016 between Sydow and other RB representatives. Pl. Br. at 11 (citing Pl. Ex. 60, ECF No. 219.4).  Sydow attached a document entitled "Promescent – next steps" to that email and indicated that one response to K-Y Duration's launch may be a challenge that RB "acquired actual knowledge that enabled [it] to launch in the first place / launch

more successfully." Pl. Ex. 60 at RB 35358.  Although Defendant argues that this single document does not show its use of Absorption's trade secrets, see Def. Reply Br. at 4-5, ECF No. 220, that is an issue to be resolved at trial.  See Sonoma, 2018 WL 3398940, at *5 (finding triable issue of fact where defendant "attached two test methods to an email" that did not identify plaintiff's name but defendant's testimony suggested they came from plaintiff).  The Court thus denies summary judgment based on Absorption's ability to recover under the DTSA.

### ii.   Whether the Economic Loss Doctrine Bars Count Three

RB next argues that the economic loss doctrine bars Absorption's state law trade secret misappropriation claim because the parties entered the MCA, which included a confidentiality provision encompassing the parties' use and disclosure of trade secrets.  Def. Br. at 30-31.  The Court disagrees.

In New Jersey, the economic loss doctrine does not categorically bar a plaintiff from bringing tort claims where a contract exists between the parties to a lawsuit.  Rather, a plaintiff who alleges "the breaching party owes an independent duty imposed by law" may recover in tort notwithstanding the parties' contractual relationship.  Satiel v. GSI Consultants, Inc., 170 N.J. 297, 316 (2002).  An independent duty separate from contract may arise where a statute authorizes a private right of action for tortious conduct.  See Lithuanian Comm. Corp., Ltd. v. Sara Lee Hosiery, 219 F. Supp. 2d 600, 607-08 (D.N.J. 2002) ("To hold that [a] statutory claim is subsumed by plaintiff's breach of contract cause of action would be contrary to legislative intent and would preclude consumer fraud claims [under the New Jersey Consumer Fraud Act] in far too many circumstances.").  At least one court in this District has held that the economic loss doctrine does not bar claims under the New Jersey Trade Secrets Act ("NJTSA"), which imposes independent

duties on contracting parties.  Allstate Life Ins. Co. v. Stillwell, No. 15-8251, 2019 WL 2743697, at *11 (D.N.J. May 16, 2019).

RB misreads Stillwell in asserting that the court there limited its reasoning to the trade secret claims in dispute, which "were extrinsic to the limited contract claims."  Def. Reply Br. at 3 n.5.  To the contrary, the court noted the parties' contracts forbade disclosure of trade secrets.  2019 WL 2743697, at *11.  Notwithstanding those agreements, the court held that the economic loss doctrine "does not supersede the duties created by the NJSTA."  Id.  The court also observed that applying the economic loss doctrine to the NJTSA would effectively bar "all duties created by [the statute] through an express contractual duty," rendering meaningless the NJTSA's liability provision for trade secrets acquired through "the 'breach of an express . . . duty.'"  Id. at *11 n.5.

RB notes that other decisions in this District have barred NJTSA claims where the plaintiff simultaneously asserted breach of contract.  See Def. Br. at 30.  In each of those cases, the court barred the plaintiffs' state law trade secret misappropriation claims because they captured the same conduct underlying their breach of contract claims.  See Howmedica Osteonics Corp. v. Zimmer, Inc., No. 11-1857, 2012 WL 5554543, at *10 (D.N.J. Nov. 14, 2012); Trico Equip., Inc. v. Manor, No. 8-5561, 2011 WL 705703, at *3 (D.N.J. Feb. 22, 2011); Air Express Int'l v. Log-Net, Inc., No. 12-1732, 2016 WL 5334659, at *3 (D.N.J. Sept. 22, 2016)).

Those decisions are unpersuasive for several reasons.  First, two of the cases do not reference the NJTSA, and all three fail to analyze whether the statute created independent duties on which a plaintiff could bring a separate claim for trade secret misappropriation.[7]  Second, that the plaintiffs in those cases pled breaches of contract alongside trade secret misappropriation, and relied on the same facts in doing so, factored heavily into the courts' analyses.  It is not clear

---

[7] One of those cases, Trico Equipment, Inc., was decided before the NJTSA's enactment date of January 5, 2012.

whether the outcomes in those cases would have differed had the plaintiffs exclusively pled trade secret misappropriation, like Absorption. Third, and most critically, adopting the reasoning in those cases here would lead to absurd results inconsistent with the plain language of the NJTSA.

Generally, to prove misappropriation under the statute, a plaintiff must prove the defendant obtained its trade secrets through "improper means." See N.J.S.A. § 56:15-2. The NJTSA defines "improper means" to include, among other things, "breach or inducement of a breach of <u>an express</u> or implied <u>duty</u> to maintain the secrecy of, or to limit the disclosure of, a trade secret. . . ." <u>Id.</u> (emphasis added). The statute thus contemplates that an express duty between the parties to a lawsuit may exist, yet authorizes a plaintiff to seek remedies for conduct violative of the statute. The Court finds, and RB proffers, no reason to interpret this explicit provision as foreclosing actions based on express duties set forth in a contract. Further, it is not uncommon for sophisticated parties exchanging sensitive information to enter into confidentiality agreements like the MCA. Precluding a sophisticated party like Absorption from bringing a trade secrets claim merely because it entered a confidentiality agreement with another sophisticated entity would effectively foreclose any litigant who has such agreement from seeking redress under the NJTSA.

For all these reasons, the Court finds the reasoning in <u>Stillwell</u> most persuasive. Accordingly, the economic loss doctrine does not bar Absorption's trade secret misappropriation claims.

### iii.  A Reasonable Jury Could Find Misappropriation of Trade Secrets

Finally, RB asserts that no reasonable jury could find RB misappropriated Absorption's trade secrets because: (1) Absorption publicly disclosed information it claims are trade secrets to third parties; (2) RB developed K-Y Duration independently from Promescent; and (3) Absorption cannot otherwise demonstrate "trade secret information." Def. Br. at 34-40. The Court disagrees.

19

To sustain a DTSA claim, Absorption must establish: "(1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." Par Pharm, Inc. v. QuVa Pharma, Inc., 764 F. App'x 273, 278 (3d Cir. 2019).  Under the DTSA:

> (3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(c).  "[A]nalysis under the DTSA folds into that of the NJTSA," and "[t]he essential inquiry for a trade secret is whether the information derives economic value, the information is not readily ascertainable by other means, and the holder endeavors for it to remain confidential." Austar Int'l Ltd. v. AustarPharma LLC, 425 F. Supp. 3d 336, 355 (D.N.J. 2019) (internal quotation marks and citation omitted).  The plaintiff must also show that they "have taken precautions to maintain the secrecy of the trade secret.'" Id. (quoting Mu Sigma, Inc. v. Affine, Inc., No. 12-1323, 2013 WL 3772724, at *8 (D.N.J. July 7, 2013)).

Here, Absorption asserts its trade secrets to include "online cart information, consumer insight and behavior, . . . marketing strategies, pricing and sizing strategies, sales data and trends, rate of direct-to-consumer online sales, consumer survey data, trial-standard size sales splits, and the Promescent recipe." Id. at 15-16 (quoting Pl. Ex. 65 at 7-8); see also Pl. Response to Def.

20

SOMF ¶¶ 187, 205 (pricing and sizing strategies), 215 (market size), 216 (cart information), 220 (repeat customers).  Absorption has sufficiently identified its trade secrets.

Next, whether Absorption publicly disclosed its trade secrets is a genuine issue of material fact inappropriate for resolution at this stage.  See Baxter Healthcare Corp. v. HQ Specialty Pharma Corp., 157 F. Supp. 3d 407, 425 (D.N.J. Jan. 26, 2016) ("Secrecy constitutes a quintessential question of fact.").  Several of the items RB highlights as public disclosures do not form the basis of Absorption's trade secrets claims.  See Pl. Response to Def. SOMF ¶¶ 199, 202-04.  With respect to those items allegedly disclosed to third parties, Absorption representatives testified about Absorption's policy of first entering non-disclosure agreements before sharing confidential information.  See, e.g., Pl. Ex. 75, Deposition of Gregory T. Kaminski ("Kaminski Dep.") at 162:2-15, ECF No. 219.5; Deposition of Jeffrey A. Abraham ("Abraham Dep. III") at 173:13-174:13, ECF No. 219.4.  These statements are bolstered by the parties' own confidentiality agreement, which RB does not dispute they entered.  Viewing the record in Absorption's favor, there is sufficient evidence for a rational factfinder to find that Absorption took precautions to maintain the confidentiality of the trade secrets in dispute.

The Court also finds genuine issues of material fact as to whether RB developed K-Y Duration independently from Promescent and whether RB misappropriated Absorption's trade secrets.  The record contains evidence demonstrating RB's requests for, receipt of, reference to, and use of the trade secrets Absorption identified.  See, e.g., Def. Ex. 45; Pl. Exs. 41, 51, 52 at RB 21699, 60 at RB 3535861, 63.  Although RB maintains that it did not unlawfully use Absorption's trade secrets in developing K-Y Duration, Def. Br. at 36-37, resolution of this dispute is best suited for a factfinder.  For the foregoing reasons, RB's motion for summary judgment on Counts Two and Three is denied.

D.      **Tortious Interference (Count Four)**

i.      **Intentional Interference with Contract**

RB argues that summary judgment is warranted on Absorption's intentional interference with contract claim in Count Four because: (1) Absorption did not have a contract with either Auxilium[8] or Amazon; (2) Target's oral promises to carry both Promescent's standard and trial sizes are superseded by a written agreement between Absorption and Target; and (3) the written agreement required Target to purchase a Promescent product only when Target issued a purchase order, and there are no purchase orders relevant to Absorption's claims here.  Def. Br. at 24-29. Based on Absorption's failure to demonstrate interference, the Court agrees that summary judgment is warranted on Count Four as to both Target and Amazon.

To sustain a claim for tortious interference with contract or prospective economic advantage under New Jersey law, a plaintiff must establish "(1) that it had an existing contract or reasonable expectation of economic benefit or advantage; (2) that the defendant knew of the contract or expectancy; (3) that the defendant wrongfully interfered with that contract or expectancy; (4) that it is reasonably probable that the loss of the contract or prospective economic gain was a result of the interference; and (5) that damages resulted from the interference."  Read v. Profeta, 397 F. Supp. 3d 597, 641-42 (D.N.J. 2019).

a.      **Amazon**

Here, even assuming Absorption had a contractual relationship with Amazon to distribute Promescent, the record is devoid of evidence that RB interfered with that agreement.  Absorption claims that at RB's direction, Amazon flagged Promescent as an "adult" product, limiting its view in online searches, for one month after K-Y Duration's launch.  See See Pl. Br. at 8, 31; see also

---

[8] Count Four does not allege Absorption had an existing contract with Auxilium.  Nor does Absorption argue as much in its opposition to RB's summary judgment motion.

Deposition of Rahul Battula dated November 15, 2018 ("Battula Dep.") at 157:21-24 (stating that the adult-flag function is designed to hide products from "ordinary search[es]" on Amazon).  K-Y Duration, however, did not receive a similar restriction.  As support, Absorption points to emails between RB and Amazon and Battula's [9] deposition testimony, which show RB paid a merchandising fee so that Amazon would classify K-Y Duration under "condoms and lube" so that the product was not concealed from ordinary searches.  See Deposition of Rahul Battula dated November 15, 2018 ("Battula Dep.") at 140:7-141:12, Pl. Ex. 68, ECF No. 219.4; Pl. Ex. 57, ECF No. 219.4, Pl. Ex. 93, ECF No. 219.6.[10]

This proffered evidence is insufficient to demonstrate interference by RB.  It is undisputed that Amazon used K-Y Duration as test product to determine whether it could exempt male desensitizing products from the adult-flag function.  Def. SOMF ¶¶ 248-50.  Absorption has not produced any evidence showing Amazon agreed to exempt Promescent from the adult-flag function either before or during K-Y Duration's launch.  To the contrary, it appears that Amazon flagged products like Promescent and K-Y Duration as "adult" before it began testing whether that flag was necessary in August 2016.  See, e.g., Battula Dep. at 35:8-37:11, Def. Ex. 156.

Further, Amazon's and RB's negotiations to market K-Y Duration do not mention Promescent or Absorption.  That RB sought to gain a competitive advantage over Absorption in the PE market is not enough to establish intentional interference.  See Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003) ("[T]hat a breaching party acted 'to advance [its] own interest and financial position' does not establish the necessary malice or wrongful conduct" necessary for an intentional interference with contract claim) (citation omitted) (second alteration

---

[9] Battula is a former RB employee and present Amazon employee in charge of the company's Sexual Wellness business.

in original); <u>Lamorte Burns & Co., Inc. v. Walters</u>, 167 N.J. 285, 306 (2001).  The Court thus grants summary judgment in favor of RB as to Plaintiff's Amazon claim in Count Four.

**b.    Target**

Summary judgment is warranted in RB's favor on Plaintiff's Target claim for the same reason.  Even assuming Absorption and Target had an enforceable contract, the record lacks evidence demonstrating that RB interfered with that contract.

Although it is not clear from the record, Absorption suggests that on March 25, 2016, Target orally agreed to carry four display facings of Promescent.  On August 11, 2016, however, Target notified Absorption that it would carry only two trial-size facings of Promescent. Absorption claims RB interfered with its original oral agreement and relies primarily on emails between Target and RB as support: one showing that Target gave RB a "heads up" that it learned about Promescent, which "appear[ed] to have a superior technology to Duration," Pl. Ex. 59; and a second from June 2016 wherein RB advised Target that it "must have 4 facings" of K-Y Duration, to which Target responded, "[T]hat's fine."  Pl. Ex. 86, ECF No. 219.6.  Absorption claims that "[w]ithin days" of the first email, Promescent's launch in Target stores was delayed and that the "very next day" after the second email, Target "rescinded its commitment to four facings of Promescent, stating that space would be 'limited due to new launches in the category.'"  Pl. Br. at 36 (quoting Pl. Ex. 11, ECF No. 219).

These emails are insufficient to demonstrate interference by RB.  Nowhere in either email exchange does RB ask or demand Target delay Promescent's launch or limit Promescent's facings. In addition, the second email exchange occurred in June 2016—nearly two months before Target notified Absorption that it would carry only two trial-sized facings of Promescent—not the "very next day" as Absorption claims.  Absorption does not cite to any other evidence in the record on

24

which one could reasonably find RB intentionally interfered with Absorption's alleged oral agreement with Target.[11]  "Mere speculation about the possibility of the existence of . . . facts does not entitle" one to a trial.  Sterling Nat. Mortg. Co., Inc. v. Mortg. Corner, Inc., 97 F.3d 39, 45 (3d Cir. 1996).  Summary judgment on Count Four is therefore warranted.  See Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 422-23 (3d Cir. 2013) (affirming district court's grant of summary judgment on tortious interference of contract claim where plaintiff failed to show its business-competitor defendant interfered with plaintiff's contract "through fraud, dishonesty, or illegal conduct of any kind"); In-Tech Marketing Inc. v. Hasbro, Inc., 719 F. Supp. 312, 318 (D.N.J. 1989) (granting summary judgment in favor of defendants where, among other things, the plaintiffs "submitted only speculation and not evidence" showing tortious interference).[12]

### ii.    Tortious Interference with Prospective Economic Advantage

RB asserts that Absorption's tortious interference claim fails because Plaintiff did not have a "protectable economic interest" in its relationship with Auxilium.  The Court agrees.

To sustain a tortious interference with prospective economic advantage claim Absorption must "identify more than a potential relationship, but rather one that would deliver 'a reasonable expectation of economic benefit.'"  Barrett Fin. of N. Jersey, LLC v. Creative Fin. Grp. of N.J., No. 13-5621, 2018 WL 3546196, at *9 (D.N.J. July 24, 2018) (quoting Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 753 (1989)).  In addition, there must be "proof that if there had been no interference there was a reasonable probability" Absorption "would have

---

[11] Aside from the referenced emails, Absorption cites to testimony from Target's corporate representative related to Target's negotiations with RB over in-store advertising and RB's "leverage with retailers."  See Pl. Br. at 35-36. Absorption argues this testimony shows Target allowed RB to have "unprecedented in-store advertising fixtures because of their ongoing relationship," id., but as stated earlier, a party's competitive advantage is not enough alone to establish intentional interference.  See Lamorte Burns & Co., 167 N.J. at 306.

[12] For the same reasons, Absorption has not established RB intentionally interfered with any prospective economic advantage it had with Target or Amazon.

received the anticipated economic benefit."  Lamorte Burns & Co., 167 N.J. at 306 (internal quotation marks and citation omitted).

Here, viewing the record in its favor, Absorption has failed to establish a prospective economic advantage.  The majority of evidence Absorption proffers involves negotiations with Auxilium before RB contacted Absorption in June 2014.  See Pl. Ex. 16, ECF No. 219 (April and May 2014); Pl. Ex. 29, ECF No. 219.2 (January 2013).  Absorption concedes that it turned down an offer from Auxilium shortly before RB entered the picture.  Pl. Response to Def. SOMF ¶ 51. Critically, aside from Abraham's speculative statements, see Abraham Dep. II at 216:2-217:3, 218:5-16, 219:11-23, the record is devoid of any evidence showing that Absorption had a reasonable expectation of another offer from Auxilium during its ongoing negotiations with RB.

An alleged economic advantage must be a present or future benefit, not a past opportunity that the plaintiff relinquished before the defendant's involvement.  See D'Agostino v. Appliances Buy Phone, Inc., No. A-2005-13T1, 2015 WL 1043471, at *9 (N.J. Super. Ct. App. Div. Mar. 8, 2018) (citing Printing-Mart, 116 N.J. at 751).  For this reason, any reliance by Absorption on a deal from Auxilium it had rejected before engaging with RB is misplaced.  Because Count Five cannot be sustained on "mere hope that [Absorption] would have entered into some future arraignment," Mu Sigma, Inc. v. Affine, Inc., No. 12-1323, 2013 WL 3772724, at *3 (D.N.J. July 17, 2013), summary judgment is warranted.[13]

---

[13] Because Absorption failed to establish a prospective economic advantage, the Court need not discuss whether it satisfied the other requirements to sustain this claim.  The Court notes, however, that because the record is devoid of non-speculative evidence suggesting a potential economic benefit from Auxilium, Absorption naturally cannot prove RB interfered with any such benefit.

**IV.**   **CONCLUSION**

For the reasons set forth herein, Defendant's Motion for Summary Judgment, ECF No.

210, is **GRANTED in part** and **DENIED in part**.  An appropriate Order follows.

Dated:  June 25, 2020

*/s Madeline Cox Arleo*_____
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**
