# McElroy Deutsch

1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
T: 973.993.8100 | F: 973.425.0161
MDMC-LAW.COM

JOSEPH P. LASALA
Direct Dial:  (973) 425-8749
jlasala@mdmc-law.com

May 13, 2022

**VIA ECF**

Honorable Madeline Cox Arleo, U.S.D.J.
Martin Luther King, Jr. Federal Building
 and U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

<table>
<tr><td><strong>PUBLIC VERSION<br>REDACTED</strong></td></tr>
</table>

Re:     *Absorption Pharm., LLC v. Reckitt Benckiser, LLC, et al.*,
          Civil Action No. 17-12872 (MCA) (JSA)

Dear Judge Arleo:

During the cross examination of Jeffrey Abraham, Reckitt intends to play a short excerpt (the "Deposition Excerpt") from the videotaped deposition Mr. Abraham gave on December 21, 2018 in his capacity as a corporate representative of Absorption under Rule 30(b)(6).  The Deposition Excerpt (highlighted in the attached Exhibit A) appears at 203:16-204:8 and 204:16-204:24 of the transcript, and was included in the deposition designations the parties exchanged before trial.  Absorption objected to this designation pretrial on two grounds – Rule 402 & Rule 403.  Neither objection has merit.  The Deposition Excerpt shows that Mr. Abraham publicly disclosed customer retention information Absorption now claims is a trade secret, in direct contradiction of Mr. Abraham's trial testimony.

In the Deposition Excerpt, Reckitt's counsel played approximately one minute of a podcast interview of Mr. Abraham that was published on January 20, 2016 (the "Podcast Portion").  The full, 17 minute podcast remains available publicly on the internet, at https://ehealthradio.podbean.com/e/make-love-longer-ceo-of-promescent-launches-first-fda-complaint-treatment-for-pe/

In the Podcast Portion played at the deposition, Mr. Abraham discusses what he calls Promescent's " ██ " repurchase rate and gives examples of the number of times customers have chosen to purchase the product since Absorption began tracking purchases via its cart:



McElroy, Deutsch, Mulvaney & Carpenter, LLP
COLORADO    CONNECTICUT    DELAWARE    FLORIDA    MASSACHUSETTS    NEW JERSEY    NEW YORK    PENNSYLVANIA    RHODE ISLAND

# McElroy Deutsch

Honorable Madeline Cox Arleo, U.S.D.J.
May 13, 2022
Page 2

30(b)(6) Deposition of Jeffrey A. Abraham ("Abraham Dep.") at 203:16-204:8 (Dec. 21, 2018) (Ex. A). Mr. Abraham, who estimated he appears on podcasts "██████████████," *id.* at 202:6-202:7, testified at the deposition that he did not remember the specific interview, but nonetheless authenticated the recording, confirming that it was him "██████████." *Id.* at 204:16-204:24. As Mr. Abraham put it, "██████████████." *Id.* at 205:13.[1]

    The Deposition Excerpt is squarely relevant. The information Mr. Abraham confirmed discussing publicly in the Podcast Portion is what Mr. Abraham at trial called "the meat" of Absorption's allegedly proprietary "cart," that would not be shared without a confidentiality agreement. Trial Tr. at 555-57, 569-70, 577, 587 (May 12, 2022) (Ex. B). To prevail on its trade secret claim, Absorption must demonstrate that it "has taken reasonable measures to keep" this information "secret," and must show that the "information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (quoting 18 U.S.C. § 1839(3)). Evidence that Mr. Abraham personally shared his company's "secrets" with the listeners of a podcast posted for all to hear on the Internet is powerfully probative on both inquiries. It also directly rebuts his trial testimony about requiring confidentiality agreements before sharing such information. It is difficult to conceive of more relevant evidence in a trade secret case than the plaintiff's chief executive openly revealing "the meat" of the supposed trade secret. Such disclosure is sufficient, by itself, to extinguish plaintiff's claim. *See, e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.").

---

[1] Plaintiff did not preserve an authenticity objection, but in any event Mr. Abraham's testimony is more than sufficient to authenticate the Podcast Portion played during the Deposition Excerpt. *See* Fed. R. Evid. Rule 901(b)(5) (noting that evidence may be authenticated through "[a]n opinion identifying a person's voice"). The required "showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility." *Link v. Mercedes–Benz of North America*, 788 F.2d 918, 928 (3d Cir. 1986). Instead, "there need be only a prima facie showing, … not a full argument on admissibility." *Id.* Once that prima facie case is made, "it is the jury who will ultimately determine the authenticity of the evidence." *Id.* In other words, "[t]he burden of proof" to show authenticity "is slight, requiring only a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." *Rojas v. Acuity Brands Lighting, Inc.*, No. CIV.A. 12-2220 ES, 2014 WL 2926510, at *3 n.2 (D.N.J. June 27, 2014) (quoting *United States v. Balice*, 505 F. App'x 142, 146 (3d Cir. 2012) (citation omitted)). Mr. Abraham's deposition testimony self-identifying his voice on the podcast is the kind of "firsthand knowledge" that supports submitting the evidence to the jury. *Barnes Found. v. Twp. of Lower Merion*, 982 F. Supp. 970, 996 (E.D. Pa. 1997).

# McElroy Deutsch

Honorable Madeline Cox Arleo, U.S.D.J.
May 13, 2022
Page 3

     While this evidence is devastating, there is nothing remotely unfair about the prejudice that would result from its introduction.  *See, e.g.*, *United States v. Heatherly*, 985 F.3d 254, 266 (3d Cir. 2021) ("Rule 403 bars not all prejudice, but only unfair prejudice," and "[i]t does not protect [parties] from devastating evidence in general.").  Accordingly, Absorption's preserved objections under Rule 402 and Rule 403 are meritless.

     Absorption has also indicated that it objects because Magistrate Allen on April 6, 2022 denied an application from Reckitt to add the full seventeen-minute podcast to the exhibit list.  But Magistrate Allen's ruling has no bearing on the issue, and in any event, Absorption waived the argument that it does.

     Magistrate Allen's ruling is irrelevant because Reckitt is not seeking to do what Magistrate Allen addressed – play the full seventeen-minute podcast.[2]  Reckitt seeks only to play the Deposition Excerpt where Mr. Abraham listened to the approximately one-minute Podcast Portion and confirmed its authenticity.  Nothing in Magistrate Allen's ruling addressed that separate question.  And the reasoning of Magistrate Allen's ruling – that the full podcast was new to plaintiff, not produced in discovery, and not available to plaintiff in preparing its witnesses for trial testimony, Tr. of Apr. 6, 2022 Hrg. at 33:11-33:19 (Ex. C) – does not apply to the Podcast Portion, which Absorption has known about since it was played at the deposition in December 2018.

     Moreover, the objection is waived.  Absorption did not add Magistrate Allen's ruling as an additional basis to object to the designated testimony in the final pretrial order, to which it agreed *after* Magistrate Allen's ruling.  Dkt. 395-4 at 5 (Apr. 14, 2022).

     Reckitt would not object to playing other portions of the podcast, to the extent Absorption can meet the requirements under Rule 106 for doing so.  But there is no basis to exclude the properly designated and highly probative Deposition Excerpt.

---

[2] In objecting to Reckitt's proposal to add the full podcast to its exhibit list, Absorption represented to Magistrate Allen that the "URL provided by RB during Mr. Abraham's deposition as the source of the audio content during Mr. Abraham's deposition no longer exists."   Dkt. 386 at 3.  As noted above, that was incorrect.  Absorption's apparent misunderstanding may have resulted from a transcription error:  the URL for the podcast reflected in the deposition transcript is off by one letter from what the video reveals was said at the deposition ("podbea*m*" vs "podbea*n*").  Reckitt advised Absorption of that transcription error at the April 6, 2022 hearing before Magistrate Allen and provided an mp3 of the full podcast on March 11, 2022.  Tr. of Apr. 6, 2022 Hrg. at  8, 19.

# McElroy Deutsch

Honorable Madeline Cox Arleo, U.S.D.J.
May 13, 2022
Page 4

Respectfully yours,

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

*/s/ Joseph P. LaSala*

JOSEPH P. LASALA

cc:     All counsel (via ECF and e-mail)

# EXHIBIT A

## CONFIDENTIAL MATERIALS

## SUBJECT TO MOTION TO SEAL PURSUANT TO

## L.CIV.R. 5.3(c)

# EXHIBIT B

478

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW JERSEY

3

4     ABSORPTION PHARMACEUTICALS, LLC, :   Civil No.
                                            17-cv-12872-MCA
5                          Plaintiff,  :

6                    v.                 :
                                            TRANSCRIPT OF
7     RECKITT BENCKISER, LLC, and      :  TRIAL PROCEEDINGS
      DOES 1-50,
8                                      :        VOLUME 3
                           Defendants.
9     --------------------------------x

10    RECKITT BENCKISER, LLC and       :
      RB HEALTH (US) LLC,
11                                     :

              Counterclaim-Plaintiffs, :
12                                     :
                     v.                :
13                                     :
      ABSORPTION PHARMACEUTICALS, LLC, :
14                                     :
              Counterclaim-Defendants.
15    --------------------------------x

16                                       Newark, New Jersey
                                         May 12, 2022
17

18    BEFORE:

19           THE HON. MADELINE COX ARLEO, U.S.D.J.

20

21                                       Reported by:
                                         CHARLES P. McGUIRE, C.C.R.
22                                       Official Court Reporter

23

24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer-aided transcription.

479

1    APPEARANCES:

2        WALSH PIZZI O'REILLY FALANGA LLP
         Three Gateway Center
3        100 Mulberry Street
         Newark, New Jersey 07102
4        BY: LIZA M. WALSH, ESQ.
             CHRISTINE I. GANNON, ESQ., and
5            WILLIAM T. WALSH, JR., ESQ.
         And
6        PROSKAUER ROSE LLP
         2029 Century Park East
7        Los Angeles, CA 90067
         BY: JONATHAN M. WEISS, ESQ.
8            COLIN G. CABRAL, ESQ.
             KYLE A. CASAZZA, ESQ.
9            KELLY CURTIS, ESQ., and
             KEISHA-ANN G. GRAY, ESQ.
10       Attorneys for Plaintiff and Counterclaim-Defendant
         Absorption Pharmaceuticals, LLC
11

         McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
12       1300 Mount Kemble Avenue
         Morristown, New Jersey 07962-2075
13       BY: THOMAS R. CURTIN, ESQ.
             JOSEPH P. LaSALA, ESQ., and
14           KATHLEEN N. FENNELLY, ESQ.
         And
15       SHEPPARD MULLIN RICHTER & HAMPTON LLP
         30 Rockefeller Plaza
16       New York, New York 10112
         BY: PAUL W. GARRITY, ESQ.
17           RENA ANDOH, ESQ.
             TYLER E. BAKER, ESQ., and
18           MEGHAN STUER, ESQ.
         And
19       WILMER HALE
         7 World Trade Center
20       250 Greenwich Street
         New York, New York 10007
21       BY: ROBERT J. GUNTHER, JR., ESQ.
             HALLIE B. LEVIN, ESQ.
22           PETER G. NEIMAN, ESQ., and
             PAUL VANDERSLICE, ESQ.
23       Attorneys for Defendants-Counterclaim Plaintiffs
         Reckitt-Benckiser, LLC and RB Health (US) LLC
24

25

                    CHARLES P. McGUIRE, C.C.R.

555

1    full question and the full answer?

2                    THE COURT:  Yes.

3                    MR. NEIMAN:  Sure.

4    Q.    Question.  This is at page 100.

5    A.    Yes.

6    Q.    Page 100, question at line 23:

7                    "And you consider that to be confidential?

8                    "ANSWER:  I'm not sure, just the amount of repeat

9    customers.  I think the confidential part comes in when you

10   look at the ordering patterns and you look at someone buying

11   a trial and then a big, then a three-pack of big, and then

12   you see over a period, you know, because you can have people

13   -- someone order a trial, then another trial -- that's

14   interesting, but the real meat is when you get into the cart

15   and you see someone spending 800, 1,000, $1,500 in a

16   two-year period of time."

17                   Did I read that correctly?

18   A.    You read that correctly.

19   Q.    That was your sworn testimony under oath; right?

20   A.    That was my sworn testimony under oath.

21   Q.    Let's just look at the examples so the jury can see

22   one of those examples of a person spending 800, 1,000,

23   $1,500 at one time.

24                   If you can look at your big book at DX-634.

25                   MR. NEIMAN:  And I would offer Exhibit 664 at this

CHARLES P. McGUIRE, C.C.R.

556

1    time.

2              THE COURT:  Any objection?

3              MR. WEISS:  No objection.

4              THE COURT:  It's in.  You can publish.

5         (Defendant's Exhibit 634 marked in evidence)

6    Q.    Just, again, I'm sorry, it's a lot of books, but let

7    me know when you're there.

8    A.    No, I'm here.  DX-634, right?

9    Q.    And you can look at it on the screen, if it's easier.

10   A.    Oh, that's much easier.

11   Q.    For short documents.  For long documents, sometimes

12   you need the hard copy, but the short ones --

13   A.    If you're ever going to put it on here, just tell me

14   so I don't have to fumble through this, I can just look

15   right on here.

16   Q.    It's a deal.

17   A.    Okay.

18   Q.    Just take a look at DX-634, sir.

19   A.    Yeah, I can see it.

20   Q.    Okay.  And so what DX-634 is, is, this is one of those

21   examples where you can see someone spending 800, 1,000,

22   $1,500 on your product over a two-year period; right?

23   A.    That's correct.

24   Q.    This is the kind of thing that you said in your sworn

25   testimony under oath was the real meat of what you could see

CHARLES P. McGUIRE, C.C.R.

557

1    in the cart; right?

2    A.    That's correct.

3    Q.    Okay.  And this is the kind of data that you contend

4    you would want to protect with a nondisclosure agreement

5    before sharing it outside your company; right?

6    A.    That's part of the data, yes.

7    Q.    This is the kind of data; right?

8    A.    Yes.

9    Q.    Okay.  And what you've told us today is that you

10   believe data like this is very powerful evidence that your

11   product really worked.

12   A.    Yeah.

13   Q.    Yeah.  Because from your point of view, why would a

14   customer buy something over and over again, spending

15   hundreds of dollars, unless they thought it really worked

16   for them; right?

17   A.    Yes.

18   Q.    It's logical.

19   A.    It's very logical.

20   Q.    Okay.  But you wouldn't expect to see these same kind

21   of patterns for a product that didn't work as well as yours;

22   right?

23   A.    In this particular space?

24   Q.    Yes.

25   A.    Yeah, I would not expect to see that.

CHARLES P. McGUIRE, C.C.R.

569

1    have Lidocaine and thymol, you'd need to do your own

2    research to figure out what the repeat rate would be; right?

3    A.    That would be correct.

4    Q.    Your data doesn't help with that question.

5    A.    Not at all.

6    Q.    All right, sir.  We talked yesterday and also this

7    morning about this cart data and whether you would or

8    wouldn't disclose this cart data without a confidentiality

9    agreement, right?

10    A.    Yes.

11    Q.    Fair to say you were proud of what the cart data

12    showed about your product?

13    A.    That would be correct.

14    Q.    You believed it showed your product really worked.

15    A.    Yes.

16    Q.    And you were just a small company in 2014; right?

17    A.    That's correct.

18    Q.    And you really wanted to get on shelves and drugstores

19    and big-box stores?

20    A.    Indeed.

21    Q.    And you were really eager to interest big companies in

22    doing a deal with you; right?

23    A.    Yes.  They had the power that we didn't, the channel

24    power.

25    Q.    Yeah.  And you believed that your repeat purchase data

CHARLES P. McGUIRE, C.C.R.

570

1    was some of the best evidence that you could show about how

2    well your Lidocaine plus thymol product worked.

3    A.    Yes.

4    Q.    And one company that we've already talked about that

5    you spoke to about potentially doing a transaction was with

6    Absorption was a company called Church & Dwight; right?

7    A.    Yes.

8                MR. NEIMAN:  Let's put up DX0-47.

9                Actually, let me offer DX-047.  If there's no

10   objection, we can put it up.

11               THE COURT:  Any objection?

12               MR. NEIMAN:  Your Honor, may I just ask the jury,

13   because I've been moving back and forth whether they can

14   hear me when I don't have the mike on?

15               Okay.  If anybody can't, just give me a wave.

16   Just got a lot of area to cover.

17               So I'd offer DX-47.

18               MR. WEISS:  No objection.

19               THE COURT:  Thank in.  It's in.

20          (Defendant's Exhibit 047 marked in evidence)

21   Q.    Okay.  In DX-47, if you look at the second page of

22   DX-47 -- are you there, sir?

23   A.    I am now.

24   Q.    Okay.  Terrific.  And you'll see in the second page of

25   DX-047 that there's an e-mail exchange between Greg Kaminski

577

1      MR. NEIMAN:  If you blow up from where it begins,

2   "Here's the order history" -- there we go.

3   Q    What Mr. Kaminski is sending to Aspen without a

4   confidentiality agreement is an order history from a

5   customer; right?

6   A.    That's correct.

7   Q.    This comes out of your cart; right?

8   A.    Directly from the cart.

9   Q.    Okay.  This was the same kind of thing that you agreed

10  with me a few minutes ago when we looked at Exhibit 643 that

11  you try to protect with a confidentiality agreement; right?

12  A.    That's correct.

13  Q.    And there's no confidentiality agreement here.

14  A.    Not that I'm aware of.

15  Q.    And there's no e-mail from you reprimanding Mr.

16  Kaminski for sharing this information, is there?

17  A.    No, there's not.  I was probably assuming he had one

18  in place at that time.  But you're right, it was incorrect.

19  Q.    And not only does he share with -- well, sir, you

20  don't remember what you were thinking in September 2014

21  about this one e-mail, do you?

22  A.    Well, I do know that if I knew he did that without a

23  confidentiality agreement, I certainly would have addressed

24  it.

25  Q.    Well, let me just ask you my question, sir.

587

1    Q.    And it's just not one person's information; it's like,

2    I don't know, 15 people's information?

3    A.    Yes.

4    Q.    And it gives their name, their e-mail address, where

5    they live, the number of times they've ordered, and the

6    totals.

7    A.    That's correct.

8    Q.    Okay.  This is the kind of information you've been

9    telling us is confidential; right?

10   A.    Yes.

11   Q.    And it's being -- and it's in your standard deck to do

12   cold calls to pharmacies; correct?

13   A.    Yes, it appears that way.

14   Q.    Okay.  And let's take a look at the next slide.

15         And this is a single customer example.

16   A.    Yes.

17   Q.    And it has the details, not of all those customers,

18   but of one of those customers; right?

19   A.    Yes.

20   Q.    And it shows for this customer, it was one, two,

21   there, four, five, six, seven, eight different times he had

22   bought the product.

23   A.    Yes.

24   Q.    And how much money he had spent each time; right?

25   A.    Yes.

# EXHIBIT C

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEW JERSEY
 2
    _____
 3  ABSORPTION PHARMACEUTICALS,    :   Civil Action No.
    LLC,                           :   2:17-cv-12872-MCA-JSA
 4                                 :
             Plaintiff,            :
 5                                 :
        vs.                        :
 6                                 :   Newark, New Jersey
    RECKITT BENCKISER, LLC, and    :   Wednesday, April 6, 2022
 7  DOES 1-50,                     :
                                   :
 8           Defendants.           :
                                   :
 9  _____
            TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
10          BEFORE THE HONORABLE JESSICA S. ALLEN
                  UNITED STATES MAGISTRATE JUDGE
11
12  APPEARANCES:

13  For the Plaintiff:         Walsh Pizzi O'Reilly Falanga, LLP
                               By:  WILLIAM T. WALSH, JR., ESQ.
14                                  CHRISTINE I. GANNON, ESQ.
                               Three Gateway Center
15                             100 Mulberry Street, 15th Floor
                               Newark, NJ 07102
16

17                             Proskauer Rose, LLP
                               By:  COLIN G. CABRAL, ESQ.
18                             2049 Century Park East, Suite 3200
                               Los Angeles, CA 90067-3206
19

20  Transcription Company:     KLJ Transcription Service, LLC
                               P.O. Box 8627
21                             Saddle Brook, NJ 07663
                               (201)703-1670 - Fax (201)703-5623
22                             www.kljtranscription.com
                               info@kljtranscription.com
23

24  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
25
```

```
 1    APPEARANCES (Cont.):

 2    For Defendant Reckitt
      Benckiser, LLC:                 McElroy, Deutsch, Mulvaney &
 3                                     Carpenter, LLP
                                       By:  THOMAS R. CURTIN, ESQ.
 4                                          JOSEPH P. LaSALA, ESQ.
                                            KATHLEEN N. FENNELLY, ESQ.
 5                                     1300 Mount Kemble Avenue
                                       Morristown, NJ 07962
 6

 7                                     Sheppard, Mullin, Richter
                                       & Hampton, LLP
 8                                     By:  TYLER E. BAKER, ESQ.
                                       30 Rockefeller Plaza
 9                                     New York, NY 10112-0015

10
                                       Wilmer, Cutler, Pickering, Hale
11                                     & Dorr, LLP
                                       By:  ROBERT J. GUNTHER, JR., ESQ.
12                                          HALLIE B. LEVIN, ESQ.
                                       7 World Trade Center
13                                     250 Greenwich Street
                                       New York, NY 10007
14

15                                     Wilmer, Cutler, Pickering, Hale
                                       & Dorr, LLP
16                                     By:  PAUL VANDERSLICE, ESQ.
                                       1875 Pennsylvania Avenue, N.W.
17                                     Washington, DC 20006

18

19

20

21

22

23

24

25
```

1   know that -- and as my law clerk just reminded me from when I

2   originally reviewed the letters -- that the opening letter

3   that Mr. LaSala had filed, was filed under seal.  So, for

4   purposes of this discussion, I don't think we need to get into

5   anything -- and I don't think there was a motion to seal, but

6   we'll put that aside for a second.  But I don't think there's

7   anything that would require me to seal this record.  I don't

8   think I need to get down into that level, to the extent we're

9   talking about confidential information or sensitive business

10  information and the like, but remind me at the end of this if

11  anyone disagrees and whether they want to make any application

12  before the conference call is over.

13          So, there's this one podcast, going back to it, that

14  is -- there's an objection.  And then, in addition to that,

15  there are 40 documents?  Is that fair to say?

16          MR. GUNTHER:  Your Honor -- Your Honor, this is Bob

17  Gunther.  I think that's correct.  I think that the podcast is

18  sort of -- you know, it's -- we -- I -- we provided it to them

19  as an MP3 file at the time that we filed our letter on the 20

20  -- on the -- that we gave their -- we made the initial request

21  to them on March 11th and gave them an MP3 file of that, and

22  then the others are documents, as I understand it.

23          THE COURT:  Okay.  All right.  Thank you for that

24  clarification.

25          All right.  So that's the first question I had.

1   as an exhibit, because it's a -- it's a WAV file --

2            THE COURT:  Mm-hmm.

3            MR. GUNTHER:  -- and it -- but -- and it was not

4   produced in -- in the sense of we didn't sort of download it

5   and then transcribe it or something.  But we did give them,

6   albeit it with a -- one -- a typo in the -- in the way that it

7   was transcribed in the record, we did give them the website

8   address for the podcast, which is still there.  I mean, it's

9   not -- you know, you can get it today.  And so it's -- it -- I

10  -- from a -- in terms of production, I would argue that that

11  was the functional equivalent of producing the documents.

12           THE COURT:  All right.  And my last question then.

13  Any reason why -- I guess -- or is this exhibit and all the

14  other exhibits either that the plaintiff does object to or not

15  object to why -- the basis for why you are seeking to amend

16  further the amended pretrial -- final pretrial order is

17  because just sort of, as you're preparing for trial, you

18  realized that these documents you're going to maybe rely on?

19  To the extent --

20           MR. GUNTHER:  Yes, Your Honor.

21           THE COURT:  -- they're admissible?

22           MR. GUNTHER:  Yes, Your Honor.  With --

23           THE COURT:  Okay.

24           MR. GUNTHER:  With this -- with this -- with this

25  sort of -- sort of gloss on it.  What -- after the -- after

1   previously, then I will not allow any such amendment.  First,

2   it cannot be said that there would be no surprise to the

3   plaintiff.  For these documents -- and I am going to -- I

4   don't have specific numbers, other than as we've talked about

5   and identified.  DX-817, for example, there is no dispute that

6   this news article was not produced in discovery.

7          As to DX-860, the podcast, there is no dispute that

8   it was -- that a witness was in part cross-examined about it,

9   but there's also dispute that there was an objection made by

10  plaintiff's counsel, and it was not marked as an exhibit, and

11  it was not at any time produced in discovery.  Although, again

12  I mention it was referenced at a deposition that took place

13  back in 2018.

14         And so these documents and their late inclusion

15  within the amended final pretrial order may require, and

16  indeed likely will require, plaintiffs to thoroughly review

17  the podcast, which it's already been represented is not

18  available any longer on a public website, perhaps re-prepare

19  witnesses, and to perform an array of attendant tasks.  In

20  that respect, to allow the inclusion of these documents will

21  disrupt the orderly and efficient trial of this action --

22  which, as I said, is eight weeks away and nearly four months

23  after preparation and entry of the amended final pretrial

24  order -- by invariably resulting in requests for -- if not for

25  an adjournment of the trial, and possibly even a request for

1  some additional limited discovery.

2       The cumulative effect of allowing these belated

3  amendments renders this aspect unreasonable, given the time

4  constraints.  And, further, final pretrial orders would stop

5  having any meaning if the Court were to allow parties to add

6  trial exhibit documents that were not previously produced in

7  discovery.  And, as I mentioned, I find that these documents

8  were not previously produced in discovery.

9       And so, for these reasons, the defendant's request

10 to amend the amended final pretrial order will be denied with

11 respect to Exhibit DX-817 and DX-860.

12      Now, for documents produced in discovery -- and I've

13 already made it the -- a ruling that I find that DX-860 was

14 not produced in discovery, either by way of a supplemental

15 document or material production or in any way updating initial

16 disclosures and the like.

17      But if documents -- for those that were produced in

18 discovery, the balance of the documents that defendant is

19 looking to add as amendment -- amended trial exhibit list, I

20 will allow those exhibit -- those amendments, because

21 plaintiff had the documents during discovery and so were on

22 notice of their asserted relevance to the issues and the

23 claims and the defenses in the case.

24      Even if allowing the amendment causes some

25 incidental prejudice, plaintiff will have the opportunity to