# McElroy Deutsch

1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
**T:** 973.993.8100 | **F:** 973.425.0161
**MDMC-LAW.COM**

THOMAS R. CURTIN
Direct Dial:  (973) 401-7117
tcurtin@mdmc-law.com

May 15, 2022

**VIA ECF**

Honorable Madeline Cox Arleo, U.S.D.J.
Martin Luther King, Jr. Federal Building
 and U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> Re: *Absorption Pharm., LLC v. Reckitt Benckiser, LLC, et al.*,
> Civil Action No. 17-12872 (MCA) (JSA)

Dear Judge Arleo:

Defendant Reckitt Benckiser LLC respectfully submits that this Court should not permit Absorption Pharmaceuticals LLC to call Elizabeth Gilbert as a witness.  Reckitt has not "attacked" Jeffrey Abraham's general character for truthfulness within the meaning of Fed. R. Evid. 608(a), and the proffered testimony would be unfairly prejudicial, irrelevant, and otherwise inadmissible.

## I.    RULE 608(A) PRECLUDES MS. GILBERT FROM TESTIFYING ABOUT MR. ABRAHAM'S CHARACTER FOR TRUTHFULNESS

Ms. Gilbert is the widow of Absorption's founder (Dr. Ron Gilbert) and a minority shareholder in Absorption.  Because she lacks direct knowledge of anything relevant to this case and testimony about her relationship to Absorption necessarily will cause undue prejudice, Reckitt previously filed a motion *in limine* to exclude Ms. Gilbert's testimony.  *See* Dkts. 315, 316.  In contesting that motion, Absorption abandoned any argument that Ms. Gilbert should be permitted to testify other than on the limited issue of Mr. Abraham's character for truthfulness.  *See* Hrg. on Mots. Tr. at 111:2-112:3 (Dec. 21, 2021) (Ex. A).  The Court reserved ruling on whether such testimony would be permissible under Rule 608(a) in order to consider the scope of Reckitt's cross-examination of Mr. Abraham.  *Id.* at 112:4-6; Dkt. 381 at 3.  That examination having begun, Absorption now seeks to call Ms. Gilbert to rehabilitate his character for truthfulness.  *See, e.g.*, Trial Tr. at 484:5-484:6 (May 12, 2022) (Ex. B) (stating that Ms. Gilbert will testify about Mr. Abraham's "capacity for truthfulness").  Because Reckitt has not "attacked" Mr. Abraham's character for truthfulness within the meaning of Fed. R. Evid. 608(a), Reckitt asks that the Court—at the conclusion of Mr. Abraham's cross examination—exclude the proffered testimony.

"Generally, evidence of a person's character" like that which Absorption seeks to offer "is not admissible for the purpose of proving action in conformity therewith."  *Renda v. King*, 347

# McElroy Deutsch

Honorable Madeline Cox Arleo, U.S.D.J.
May 15, 2022
Page 2

F.3d 550, 553-54 (3d Cir. 2003). In limited circumstances, however, Rule 608(a) permits "[a] witness's credibility" to be "supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."[1] Such evidence "is admissible only after the witness's character for truthfulness has been attacked." Fed. R. Evid. 608(a). Critically, even "*[d]irect attacks on a witness's veracity in the particular case* do not open the door for evidence of the witness's good character." *Renda*, 347 F.3d at 554 (emphasis added); *accord United States v. Dring*, 930 F.2d 687, 690 (9th Cir. 1991) ("The purpose of Rule 608(a)[] is to encourage direct attacks on a witness's veracity in the instant case and to discourage peripheral attacks on the witness's general character for truthfulness.").

Reckitt's cross-examination of Mr. Abraham has and will not constitute the kind of peripheral attacks on his "general character for truthfulness" that would permit the introduction of rehabilitative testimony. *Dring*, 930 F.2d at 690. Reckitt, for example, has introduced evidence of Mr. Abraham's prior inconsistent statements about Reckitt's level of interest in Absorption's cart data and the importance Absorption assigned to repeat customer spending. *See, e.g.*, Trial Tr. at 544:22-545:1, 553:19-555:20 (May 12, 2022). But the "use of prior inconsistent statements during [a] cross-examination" does not generally "r[ise] to the level of an attack on [a witness's] character for truthfulness." *Coney v. NPR, Inc.*, 312 F. App'x 469, 474-75 (3d Cir. 2009). So long as the examination "focuses on the credibility of the witness in the present case without relying on prior acts of corruption or bad character," it does not open the door to rehabilitative character evidence. *Dring*, 930 F.2d at 691 n.5.

Here, Reckitt has not introduced any peripheral evidence of "prior acts of corruption or bad character," and has focused exclusively on Mr. Abraham's statements regarding the issues in dispute in this case. This kind of "vigorous cross-examination" and "pointing out by [opposing counsel] of discrepancies … does not call into question the reputation of [Mr. Abraham] for truthfulness" under Rule 608(a). *United States v. Danehy*, 680 F.2d 1311, 1314 (11th Cir. 1982). To the contrary—"[t]he mere fact that a witness is contradicted by other evidence in a case does not constitute an attack upon his reputation for truth and veracity," *id.*, in particular when the

---

[1] Where the predicate for character testimony is established, Rule 608(a) permits only "limited reputation testimony," and "the scope of any such character evidence is strictly limited to [the witness's] reputation for truthfulness." *Nelson v. Boro Properties, LLC*, No. 06-CV-2855, 2007 WL 9812994, at *2 (E.D. Pa. Sept. 27, 2007); *accord* Fed. R. Evid. 608, advisory committee's note to 1972 proposed rules ("In accordance with the bulk of judicial authority, the inquiry is strictly limited to character for veracity, rather than allowing evidence as to character generally."). Testimony as to a witness's more general "reputation in the community," or reputation for fair dealing, for example, is not permitted. *United States v. Greer*, 643 F.2d 280, 283 (5th Cir. 1981); *United States v. Herzberg*, 558 F.2d 1219, 1223 (5th Cir. 1977) (while rebuttal testimony about witness's reputation for truthfulness permitted, broader "testimony as to [witness's] reputation in the community (Phoenix) for honesty and fair dealing" not permissible). Moreover, even where character evidence is permitted under Rule 608(a), Rule 608(b) precludes testimony about particular instances of past conduct to support the character testimony. *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 147-48 (3d Cir. 2000) (witness may not testify as to "past incidents of untruthfulness" of another witness under Rule 608(b)); *United States v. Murray*, 103 F.3d 310, 322 (3d Cir. 1997) (same, for truthfulness).

# McElroy Deutsch

Honorable Madeline Cox Arleo, U.S.D.J.
May 15, 2022
Page 3

contradiction concerns a topic raised with the witness on direct, *United States v. Martinez*, 923 F.3d 806, 816 (10th Cir. 2019) (challenging the "account of the facts" given on direct examination does not "attack[] the witness's veracity in general").

Rebuttal character evidence going to truthfulness is instead permissible only where a party has asserted that a witness suffers from "a *general* predisposition to lie," such that the jury is being asked "to infer that the witness is lying at present simply because he has lied often in the past." *Renda*, 347 F.3d at 554 (emphasis added); *accord United States v. Murray*, 103 F.3d 310, 321 (3d Cir. 1997) (character evidence permitted to rehabilitate witness when cross-examination focused on his "various illegal and sordid activities"). Once more, Reckitt has made no such argument in this case. It has focused its examination of Mr. Abraham on particular misrepresentations relating directly to the issues disputed here, including misrepresentations that Mr. Abraham has already conceded were untrue. *E.g.*, Trial Tr. at 503-10 (May 12, 2022) (acknowledging on direct that Mr. Abraham did not tell Reckitt the truth about interest in Promescent). Reckitt's questioning— especially in light of Mr. Abraham's admitted untruthfulness in his dealings with Reckitt—does not "attack[]" Mr. Abraham's character within the meaning of the Rule.[2]

## II.   RULE 403 PRECLUDES MS. GILBERT'S CHARACTER TESTIMONY

The proposed character testimony raises serious issues under Rule 403. Testimony about a reputation for truthfulness is typically offered where the witness has *denied* making false statements and is seeking to buttress that denial with evidence that speaking falsely would be out of character. *See, e.g.*, *Renda*, 347 F.3d at 555-56. Here, however, Mr. Abraham conceded in direct examination making multiple untrue statements to Reckitt during negotiations. *E.g.*, Trial Tr. at 503-10 (May 12, 2022). The proffered evidence therefore has very low probative value, if any. But the potential for unfair prejudice is high. Absorption has already injected into the record—through non-responsive answers from Mr. Abraham—improper testimony about the financial circumstances of Dr. Gilbert's family (Trial Tr. at 441 (May 11, 2022) (Ex. C)). There is ample reason to be concerned that Ms. Gilbert's testimony is designed to elicit general sympathy, rather than to address the facts in dispute in this case. If there were any basis to call a character witness to try to rehabilitate Mr. Abraham's character (and there is none), the fact that Absorption is pushing for the slain doctor's widow to be that person underscores the unfair prejudice that Absorption is attempting to inject into this case. For this additional reason, the proffered character testimony should be excluded.

---

[2]     Absorption also suggests that Reckitt's opening statement and cross-examination of Dr. De Pretre constituted attacks under Rule 608(a) because that "put [Mr. Abraham's] credibility at issue." Trial Tr. at 484:8-10 (May 12, 2022). Absorption has not identified what aspects of the cross or opening attacked Mr. Abraham's general character for truthfulness. As noted above, identifying specific instances in which Mr. Abraham's statements were contradicted by other evidence "in the particular case" at bar does not constitute an attack under Rule 608(a). *Renda v. King*, 347 F.3d 550, 554 (3d Cir. 2003).

# McElroy Deutsch

Honorable Madeline Cox Arleo, U.S.D.J.
May 15, 2022
Page 4

**III.   THIS COURT ALREADY HELD THAT MS. GILBERT SHOULD NOT BE PERMITTED TO TESTIFY ABOUT HER GENERAL RELATIONSHIP WITH ABSORPTION AND MR. ABRAHAM**

Absorption also appears to be backing away from its representation at the hearing on the motions *in limine* that it would only call Ms. Gilbert to testify to Mr. Abraham's character for truthfulness.  During the discussion of this issue on Thursday, Absorption asserted that it seeks to have Ms. Gilbert testify about "her relationship with [Mr. Abraham] as a shareholder," "provide general background as to … how the company was formed and how she met Mr. Abraham," and assert "that Mr. Abraham received [an] offer from Auxilium" that "she heard" or "knows about." Trial Tr. at 483:12-483:18, 484:5-484:7 (May 12, 2022).  But as this Court explained at the hearing on the motions *in limine*, Ms. Gilbert's status as a shareholder "doesn't mean anything," and "[s]he can't talk about what [Mr. Abraham] said to her." Hrg. on Mots. Tr. at 110:13-110:18.  Absorption then agreed that they would only call Ms. Gilbert "under Rule 608(a) … as a witness to rehabilitate [Mr. Abraham's] character for truthfulness." *Id.* 111:10-111:11.  Given the Court's guidance at the hearing, Absorption's representations, and for the reasons stated in Reckitt's motion, Ms. Gilbert's testimony on these additional topics would be irrelevant, hearsay, and/or cause unfair prejudice.  It should be excluded.

* * *

For these reasons, the Court should exclude Ms. Gilbert's testimony.  If the Court were inclined to permit any testimony from Ms. Gilbert, given the substantial risk of unfair prejudice, Reckitt respectfully requests that the Court hold a hearing outside the presence of the jury during which Absorption be required to proffer Ms. Gilbert's proposed direct testimony.

Respectfully yours,

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

*/s/ Thomas R. Curtin*

THOMAS R. CURTIN

cc:     All counsel (via ECF and e-mail)

# EXHIBIT A

1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3

4    ABSORPTION PHARMACEUTICALS, LLC, :    Civil No.
                                           17-cv-12872-MCA
5                       Plaintiff,  :

6              v.                   :
                                           TRANSCRIPT OF
7    RECKITT BENCKISER, LLC, and    :    HEARING ON MOTIONS
     DOES 1-50,
8                                   :
                        Defendants.
9    --------------------------------x

10   RECKITT BENCKISER, LLC and     :
     RB HEALTH (US) LLC,
11                                  :
            Counterclaim-Plaintiffs, :
12                                  :
                v.                  :
13                                  :
     ABSORPTION PHARMACEUTICALS, LLC, :
14                                  :
            Counterclaim-Defendants.
15   --------------------------------x

16                                    Via Zoom Teleconference
                                      December 21, 2021
17

18   BEFORE:

19          THE HON. MADELINE COX ARLEO, U.S.D.J.

20

21                                    Reported by:
                                      CHARLES P. McGUIRE, C.C.R.
22                                    Official Court Reporter

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

2

1   APPEARANCES:

2        WALSH PIZZI O'REILLY FALANGA LLP
         Three Gateway Center
3        100 Mulberry Street
         Newark, New Jersey 07102
4        BY: WILLIAM T. WALSH, ESQ., and
             CHRISTINE I. GANNON, ESQ.,
5        And
         PROSKAUER ROSE LLP
6        2029 Century Park East
         Los Angeles, CA 90067
7        BY: JONATHAN M. WEISS, ESQ.
             COLIN G. CABRAL, ESQ.
8            KYLE A. CASAZZA, ESQ., and
             KELLY CURTIS, ESQ.
9        Attorneys for Plaintiff and Counterclaim-Defendant
         Absorption Pharmaceuticals, LLC
10
         McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
11       1300 Mount Kemble Avenue
         Morristown, New Jersey 07962-2075
12       BY: THOMAS R. CURTIN, ESQ.
             JOSEPH P. LaSALA, ESQ., and
13           GEORGE JONES, ESQ.
         And
14       SHEPPARD MULLIN RICHTER & HAMPTON LLP
         30 Rockefeller Plaza
15       New York, New York 10112
         BY: PAUL W. GARRITY, ESQ.
16           RENA ANDOH, ESQ., and
             TYLER E. BAKER, ESQ.
17       And
         WILMER HALE
18       7 World Trade Center
         250 Greenwich Street
19       New York, New York 10007
         BY: PETER G. NEIMAN, ESQ.
20       Attorneys for Defendants-Counterclaim Plaintiffs
         Reckitt-Benckiser, LLC and RB Health (US) LLC
21

22

23

24

25

1          And so, you know, we don't have Dr. Gilbert.

2    Ms. Gilbert can testify as to the background there, which is

3    a critical piece of background.

4          But, importantly, Your Honor, she's the

5    second-largest shareholder in Absorption Pharmaceuticals,

6    and so she is in touch constantly with Mr. Abraham, the CEO

7    of the company, in connection with all of these developments

8    about acquisition interest from other parties --

9          THE COURT:  Listen, just because she's in touch,

10   she has hearsay information from Abraham -- I'm telling you

11   guys, we're not going to waste anybody's time.  Just because

12   she's the biggest shareholder doesn't mean anything to me.

13   The fact that she talks to Abraham doesn't mean anything to

14   me.  She's the widow of the founder.  What does she have

15   knowledge about?  She can't talk about what he said to her,

16   she can't talk about generally about what Abraham says to

17   her.  She has to talk about her own knowledge and what her

18   own views are.

19         What is she going to testify about?  If I were to

20   say, what's the crux of her testimony, what would you say?

21         MR. WEISS:  So, Your Honor, the crux of it -- and

22   again, the fact that she is the second-largest shareholder

23   is significant, Your Honor.  This is her livelihood.

24         THE COURT:  But she has to have something to say.

25   I mean, she could be the 99-percent shareholder.  She still

1    has to have something to say.

2              MR. WEISS:  Yes, and what they have indicated that

3    they're going to do, and there's no ambiguity about this,

4    they've been very up front about it, you've seen it in the

5    summary judgment briefing, is that they're going to attack

6    Mr. Abraham as -- you know, they call him a huckster, a

7    liar, he has a casual connection with the truth.  You know,

8    they've offered all these documents on their list that they

9    will offer into evidence about his lying.

10             And Ms. Gilbert under Rule 608(a) can be sponsored

11   as a witness to rehabilitate his character for truthfulness.

12             THE COURT:  So she'll be a rebuttal witness, then?

13             MR. WEISS:  If they attack Mr. Abraham's character

14   for truthfulness, she is a very important witness under

15   608(a).

16             THE COURT:  Well, she'll be a rebuttal witness,

17   then; right?

18             MR. WEISS:  Yes, in response to their attack.

19             THE COURT:  She won't be an affirmative witness,

20   she'll be a rebuttal witness; right?

21             MR. WEISS:  Well, I think, you know, just because

22   of the nature of how we're ordering the case, we're going to

23   bring Mr. Abraham in our case-in-chief, and they're going to

24   cross him in our case, and then after that cross, if they

25   attack his character for truthfulness, we would sponsor

1    testimony from her as to his character for truthfulness.  So

2    it would be in our case, Your Honor, after they attack his

3    character for truthfulness, as 608(a) allows you to do.

4            THE COURT:  We're going to wait on her, and I'm

5    going to take a look at 608(a) after this happens and see

6    what happens.  I have to think about that under 608(a).

7            But that's the proffer.  That's the proffer:

8    They're going to rehabilitate him under -- she's going to be

9    a character witness.

10           MS. ANDOH:  Your Honor, I think the only thing I

11   would say about that, and obviously I totally understood

12   that Your Honor is taking this under submission, is, I don't

13   know how her testifying to his character as a person in his

14   dealings with her has anything to do with his character that

15   would be at issue in this case.  It has to do with his

16   business dealings and his negotiations.  In other words,

17   she's not a business counterparty, and the fact that she is

18   a shareholder because she inherited her husband's shares

19   doesn't make her somebody who is in the sexual wellness

20   industry, somebody who is aware of his reputation in the

21   industry, or otherwise capable of testifying in a manner

22   that's really going to be probative.

23           Having said all of that, understood that Your

24   Honor wants to look at --

25           THE COURT:  Yes, I want to wait and hear about Ms.

1    Gilbert, okay?  We'll put that on hold as well.

2            Let's talk about evidence relating to the initial

3    version of K-Y Duration.

4            MS. ANDOH:  So, Your Honor, I can be honest here:

5    I actually am not sure that this is even relevant anymore,

6    because, as I understand it, their arguments as to why it is

7    they want to talk about subsequent versions of K-Y Duration

8    have to do with their market damage theory, which has now

9    been precluded.

10           MS. CURTIS:  Your Honor, this is Kelly Curtis for

11   Absorption.

12           While that was one of our arguments on this issue,

13   that is not the only argument.  We would still argue that

14   evidence of a next-generation product is relevant to the

15   claim of trade secret misappropriation here.

16           There is evidence that RB accessed Absorption's

17   formula in the context of developing the improvement

18   product, is what RB refers to as the next-generation

19   product.

20           THE COURT:  And that was in '15, after all the

21   negotiations broke down; right?

22           MS. CURTIS:  Yes, exactly, it's in November of

23   2015, and they accessed the formula as a potential

24   improvement product.

25           THE COURT:  That they randomly accessed some old

CHARLES P. McGUIRE, C.C.R.

# EXHIBIT B

478

1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW JERSEY

3

4    ABSORPTION PHARMACEUTICALS, LLC, :   Civil No.
                                          17-cv-12872-MCA
5                       Plaintiff,   :

6              v.                    :
                                              TRANSCRIPT OF
7    RECKITT BENCKISER, LLC, and     :   TRIAL PROCEEDINGS
     DOES 1-50,
8                                    :          VOLUME 3
                       Defendants.
9    --------------------------------x

10   RECKITT BENCKISER, LLC and      :
     RB HEALTH (US) LLC,
11                                   :
            Counterclaim-Plaintiffs, :
12                                   :
                v.                   :
13                                   :
     ABSORPTION PHARMACEUTICALS, LLC,:
14                                   :
            Counterclaim-Defendants. :
15   --------------------------------x

16                                       Newark, New Jersey
                                         May 12, 2022
17

18   BEFORE:

19          THE HON. MADELINE COX ARLEO, U.S.D.J.

20

21                                   Reported by:
                                     CHARLES P. McGUIRE, C.C.R.
22                                   Official Court Reporter

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

479

1     APPEARANCES:

2         WALSH PIZZI O'REILLY FALANGA LLP
          Three Gateway Center
3         100 Mulberry Street
          Newark, New Jersey 07102
4         BY: LIZA M. WALSH, ESQ.
              CHRISTINE I. GANNON, ESQ., and
5             WILLIAM T. WALSH, JR., ESQ.
          And
6         PROSKAUER ROSE LLP
          2029 Century Park East
7         Los Angeles, CA 90067
          BY: JONATHAN M. WEISS, ESQ.
8             COLIN G. CABRAL, ESQ.
              KYLE A. CASAZZA, ESQ.
9             KELLY CURTIS, ESQ., and
              KEISHA-ANN G. GRAY, ESQ.
10        Attorneys for Plaintiff and Counterclaim-Defendant
          Absorption Pharmaceuticals, LLC
11
          McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
12        1300 Mount Kemble Avenue
          Morristown, New Jersey 07962-2075
13        BY: THOMAS R. CURTIN, ESQ.
              JOSEPH P. LaSALA, ESQ., and
14            KATHLEEN N. FENNELLY, ESQ.
          And
15        SHEPPARD MULLIN RICHTER & HAMPTON LLP
          30 Rockefeller Plaza
16        New York, New York 10112
          BY: PAUL W. GARRITY, ESQ.
17            RENA ANDOH, ESQ.
              TYLER E. BAKER, ESQ., and
18            MEGHAN STUER, ESQ.
          And
19        WILMER HALE
          7 World Trade Center
20        250 Greenwich Street
          New York, New York 10007
21        BY: ROBERT J. GUNTHER, JR., ESQ.
              HALLIE B. LEVIN, ESQ.
22            PETER G. NEIMAN, ESQ., and
              PAUL VANDERSLICE, ESQ.
23        Attorneys for Defendants-Counterclaim Plaintiffs
          Reckitt-Benckiser, LLC and RB Health (US) LLC
24

25

                        CHARLES P. McGUIRE, C.C.R.

483

1   until we complete Mr. Abraham's deposition -- I mean, trial

2   testimony.

3            MR. GUNTHER:  I think that's fair.

4            THE COURT:  So, we'll proceed, and then we'll take

5   a close look at the rule, and I'm not going to decide it

6   until I hear everything.

7            So, Mr. Walsh, any other -- what's the proffer for

8   her?

9            MR. WALSH:  The proffer for her, Your Honor, is

10  that she has direct knowledge of issues in this case that

11  Defendants are trying to impeach Mr. Abraham's credibility

12  concerning, specifically about offers that he received or an

13  offer he received from Auxilium.

14           She's also going to provide general background as

15  to, you know, how the company was formed and how she met Mr.

16  Abraham, just so the jury has proper context, but mainly

17  that Mr. Abraham received that offer from Auxilium, she

18  heard -- she knows about --

19           THE COURT:  Is the fact that Mr. Abraham received

20  an offer from Auxilium, is that in dispute in this case?

21           MR. GUNTHER:  It is.

22           And, Your Honor, Mr. Wills, who was the man that

23  Mr. Abraham negotiated, we're going to call him as a

24  witness.

25           THE COURT:  So isn't it premature to deal with Ms.

484

1    Gilbert until at least the fact becomes in dispute so we can

2    have a fulsome ruling on her testimony?

3            MR. WALSH:  Well, that's not the only thing that

4    she's going to testify about, Your Honor.  She's also going

5    to testify about his capacity for truthfulness and her

6    relationship with him as a shareholder, the second-largest

7    shareholders of the company.

8            Defendants have already put his credibility at

9    issue in their opening statement; they've done it, you know,

10   in cross-examination of Mr. De Pretre.  They've also

11   indicated that they're going to cross-examine him at least

12   on Defendant's Exhibit 51, where Mr. Kaminski said that he

13   has an offputting style that RB didn't like, so she's going

14   to be there to rehabilitate him on those points as well.

15           THE COURT:  Okay.  Here's what I'm going to do.

16   I'm going to reserve on that motion and the scope of her

17   testimony until I hear everything from Mr. Abraham.  Okay?

18   And I don't think that's going to happen today, so we'll

19   address it Monday.

20           MR. WALSH:  Okay.  Thank you, Your Honor.

21           MR. GUNTHER:  Thank you, Your Honor.

22           THE COURT:  And I'll definitely give you enough

23   time so you can prepare her for it.  Okay?

24           Is there any way -- and I don't want to interrupt,

25   Mr. Walsh, your order of witnesses, but is there any way

CHARLES P. McGUIRE, C.C.R.

503

1    A.    Yes.

2    Q.    What individuals are you referring to here, Mr.

3    Abraham?

4    A.    I'm assuming that it was Kavan Stewart and Brian

5    Robertson.

6    Q.    Let's look at the last paragraph.  You write in this

7    last paragraph:  "I am going to devote every dime I have,

8    every word I speak, and every resource I possess for the

9    remainder of my life to make sure I get this story out to as

10   many people as possible."

11          You see that?

12   A.    Yes, I do.

13   Q.    Mr. Abraham, are you out to get revenge against

14   Reckitt?

15   A.    No, I'm not.  I'm out to seek justice.  I'm out to

16   hold them accountable, and I want to make my shareholders

17   and my employees and Ron's family whole.

18   Q.    Let's step back for a moment.

19          During this extended due diligence process with

20   Reckitt that lasted for a period of several months, did you

21   ever talk to other companies that were interested in

22   acquiring Absorption?

23   A.    Yes, I did.

24   Q.    And which of those companies, if you recall, did you

25   mention to Reckitt?

504

1    A.    GSK, Church & Dwight, and Auxilium, I believe.

2    Q.    And how many of these companies did you actually talk

3    to about a potential acquisition of Absorption?

4    A.    In various stages, probably two of the three.  We had

5    an initial talk with Church & Dwight, but it didn't go much

6    further.

7    Q.    Well, let's take these in turn.

8    A.    Okay.

9    Q.    So, we talked about the Auxilium proposal yesterday

10   and we saw the scenarios for an acquisition that were

11   sketched out by Alan Wills in that proposal.  Do you recall

12   that?

13   A.    That's correct.

14   Q.    So let's start there.

15         Can you remind the jury, when you engaged in

16   discussions with Auxilium about an acquisition of

17   Absorption, when exactly you engaged in those discussions

18   with Auxilium?

19   A.    Yeah.  It was December 2012 and January 2013.

20   Q.    And were you still talking to Auxilium during the due

21   diligence process with Reckitt?

22   A.    Off and on, yes.  Not -- we weren't exchanging

23   proposals, but there were still discussions that had been

24   taking place.

25   Q.    And you mentioned yesterday meeting at industry

1    events?

2    A.    Yeah.  Since we were both in the urological community,

3    we'd see them at AUA and SMSNA.  Those are the American

4    urological society -- or American Urological Association and

5    the Sexual Medicine Society of North America, and various

6    other conferences.  So three, four times a year, we'd be at

7    the same conferences.

8    Q.    And did there come a time in your discussions when

9    Auxilium ended?

10   A.    They ended early on in 2013, you know, on the official

11   thing when I said we weren't going to move forward with the

12   proposal they had sent, and then at the shows, like I said,

13   we would re-engage.  There was a gentleman who was the CEO,

14   Adrian Adams, who was particularly enamored of an

15   acquisition with us, and I used to hear this all the time,

16   and he'd come over -- really, I really bonded with him, I

17   thought he was a great guy, and he kept telling me that we

18   needed to make this happen.

19   Q.    And those later informal discussions, did those come

20   to an end at some point?

21   A.    Yeah, they came to an end in probably May of 2014.

22   Q.    And do you know why they came to an end?

23   A.    I started dealing with RB, and I felt they were a much

24   superior partner.  And then they got acquired.

25   Q.    They got acquired?

506

1    A.    Auxilium got acquired, yes.

2    Q.    Do you know who acquired them?

3    A.    Yes.  Endo Pharmaceuticals.

4    Q.    And do you know when Endo Pharmaceuticals acquired

5    them?

6    A.    Yeah.  It was probably in September-October time frame

7    of 2014.

8    Q.    And do you recall when that acquisition was announced?

9    A.    Probably in that similar time frame.  Sometimes they

10    announce it about a month before it actually happens, so

11    probably 30 days before that.

12    Q.    Let's turn next to Church & Dwight.

13    A.    Yes.

14    Q.    You mentioned Church & Dwight.  Did you discuss a

15    potential acquisition with Church & Dwight?

16    A.    No, we had a preliminary early call with C & D, but

17    they would not sign an NDA.  So when they -- we didn't have

18    any real opportunity to show them any of our -- call them

19    the crown jewels, if you will, or the things that would

20    really get someone interested in acquiring us.  So those

21    quickly went nowhere.

22    Q.    Did you exchange any information, nonconfidential

23    information?

24    A.    Yeah, we exchanged nonconfidential information.

25    Q.    And do you know generally speaking during what time

1    frame these discussions or this exchange of information,

2    nonconfidential information took place?

3    A.    Yeah, that was -- I believe in May, maybe late May,

4    early June.  It was right around the first time I met with

5    Volker Sydow, so it was right, either a week before or a

6    week after, right in that time frame.

7    Q.    And May-June of what year?

8    A.    May and June of 2014.

9    Q.    Thank you.

10         And did you make a presentation of any kind to

11   Church & Dwight?

12   A.    Yes, a -- a phone conversation.  I mean, it was a

13   conference call, but it wasn't anything in person.

14   Q.    And during that conference call, did you share any

15   confidential information with them?

16   A.    No, we did not.  We did not have an NDA in place, so

17   therefore, we did not share any confidential information.

18   Q.    Did you ever consider sending Church & Dwight

19   confidential information without their commitment to an NDA?

20   A.    No.

21   Q.    And why not?

22   A.    Well, that's the whole purpose of having the NDA is to

23   protect yourself.  So I would not send that without the NDA.

24   Q.    And how did your talks with Church & Dwight come to an

25   end?

1     A.     They just fizzled out after that first phone call.

2     Q.     Okay.  And let's talk about the third company you

3     mentioned, GSK.  Is that GlaxoSmithKline?

4     A.     It would be GlaxoSmithKline.  Yes, it would be.

5     Q.     Did you have any discussions with GSK regarding a

6     potential acquisition of Absorption?

7     A.     Yes, a gentleman by the name of Mike Manyak.

8     Q.     And who is Mike Manyak?

9     A.     He was a gentleman that was introduce to me by

10    Dr. Larry Levine, who is on our advisory board, and I was

11    told his role was as some kind of a gatekeeper or doing the

12    early due diligence on potential acquisition partners.

13    Q.     And when did these discussions with GlaxoSmithKline

14    take place?

15    A.     I'm not entirely sure, but it was certainly in the

16    2014 time frame.

17    Q.     Did you ever send confidential business information to

18    GSK?

19    A.     No.

20    Q.     Why not?

21    A.     We didn't have an NDA with GSK.

22    Q.     And what was the outcome of your discussions with GSK?

23    A.     We had some preliminary phone calls, and at one point,

24    I had received an e-mail from Mike Manyak saying we had

25    passed the initial threshold and he was now submitting us

1   into phase two of the process.

2   Q.    During your talks with Reckitt, Mr. Abraham, did you

3   ever exaggerate the interest of other companies in acquiring

4   Absorption?

5   A.    Yes, I did.

6   Q.    Why did you do that?

7   A.    Two reasons.  Number one, I needed to make sure

8   whoever we talked to had the wherewithal and was willing to

9   compensate us on the value of the company.  That was number

10  one.

11          Number two, I had to create a sense of urgency, so

12  exactly the reason why we sit in this courtroom today would

13  not have happened, because, you have to understand, we were

14  a company of $2 million a year in revenue and we were

15  talking to companies that were 200 million to $20 billion of

16  revenue that literally had more people in their Human

17  Resources department than I had in my entire company.  So I

18  was entrusted as the CEO to protect my shareholders and to

19  protect my employees, and this was a very lucrative market

20  and we had the keys to the castle, we had information that

21  no one else had.  And I knew that it was human nature; all

22  you have to do is watch television and documentaries and see

23  how often big companies feast on little companies.  So it

24  was my responsibility, it was my fiduciary responsibility to

25  protect my company, and I felt that if someone felt there

1  was an urgency and that if they didn't act on something that

2  someone else would, they wouldn't undertake a process to

3  then take our information and use it against us and try to

4  enter a market.  So I did extensively, and I did it for one

5  reason:  To protect the people that I love, my shareholders

6  and my employees.

7  Q.    Mr. Abraham, you've testified at length about

8  information that Absorption provided to Reckitt during the

9  due diligence process.

10  A.    Yes, I did.

11  Q.    How much of the actual data and business information

12  that you provided to Reckitt about Absorption's business was

13  untrue?

14  A.    Zero.

15  Q.    Can you explain that?

16  A.    Yeah.  Every single piece of information that they

17  were given to use to evaluate our organization and decide on

18  whether or not to acquire us was letter perfect.  It was

19  unimpeachable.  I gave them the opportunity to evaluate our

20  company.  I provided them with exactly what they needed.

21  Did I embellish time frames and other offers?  Yes, I did.

22  Like I said, I did it so that they had the opportunity to

23  come in and determine whether or not they wanted to buy us

24  in good faith.  The reason we're here is that did not

25  happen.

544

1          MR. NEIMAN:  Well, Your Honor, he has; I want to

2     point that out.  That's what I'm trying to do.

3          THE COURT:  Okay.

4          MR. WEISS:  Your Honor, objection.  It's not clear

5     what the question was.  He didn't give a --

6          THE COURT:  An inconsistent answer.

7          MR. NEIMAN:  Well, Your Honor, I'm happy to

8     explain in open court or at sidebar.

9          THE COURT:  I'm going to let him go forward.  He's

10     going to show him the deposition transcript.

11          What?

12          MR. NEIMAN:  Can I --

13          THE COURT:  I'm sorry.

14          I'm going to allow it.  You show him the

15     deposition transcript.  We'll see if there's a consistency.

16          MR. NEIMAN:  May I play the clip, Your Honor?

17          THE COURT:  Yes, you may.

18          MR. NEIMAN:  So, Mr. Christopher, if you can play

19     the clip from the deposition, 144, line 18 to 144, line

20     seven.

21          (Excerpt played)

22     Q.    So what you told this jury here was that he reviewed

23     extensively for more than an hour, but what you said four

24     years ago was, you wouldn't say extensively, you don't know

25     about extensively, and 15 or 20 minutes; right?

545

1    A.    That's correct.

2    Q.    Sir, you believe that Promescent was the best PE spray

3    on the market; right?

4    A.    Yes.

5    Q.    And you told us yesterday that the reason Promescent

6    worked better than all those other PE sprays out there is

7    that it is something called a eutectic formula; correct?

8    A.    Correct.

9    Q.    And we'll spare everybody the chemistry, but just very

10   simply, a eutectic formula is when you combine two things

11   together and they've got a lower melting temperature than

12   either of those things separately; right?

13   A.    That's my understanding.

14   Q.    And the two things that are combined in your eutectic

15   formula are Lidocaine, the numbing agent, and thymol;

16   correct?

17   A.    Correct.

18   Q.    And what happens is, when you combine Lidocaine and

19   thymol, Lidocaine moves from a crystal to an oil, and that

20   greatly enhances the absorption rate; right?

21   A.    Again, my understanding.

22   Q.    Yeah.  And this is the special secret sauce of your

23   product; right?

24   A.    Yes.

25   Q.    This is the thing that you think virtually eliminates

553

1     evidence that your product works.

2               The cart allows you to see how often individual

3     people have bought your product; right?

4     A.    Yes.

5     Q.    And it shows in 2014 there were some people who had

6     purchased your product a bunch of times.

7     A.    Correct.

8     Q.    And there were even people who had spent hundreds or

9     in some cases thousands of dollars buying your product again

10    and again.

11    A.    That's correct.

12    Q.    That's the real meat of what you could see in your

13    cart was that there were examples of individual customers

14    spending 800, 1,000, $1,500 on your product; right?

15    A.    I think the most important facet was the customer

16    retention rate, the overall return rate.  That was part of

17    it, but the main piece was what percentage of customers that

18    buy once come back.

19    Q.    Didn't you testify in your deposition, sir, that the

20    real meat is when you get into the cart and you see someone

21    spending 800, 1,000, $1,500 in a two-year period?

22    A.    Granularly, yes, individually, but to scale it up, you

23    have to say how many people do that, not individual.  If

24    it's five, 10, 15, that could be anecdotal, but when you see

25    850, you go, that's not anecdotal, that is legitimate.

554

1   Q.    Well, but what you said in your deposition, sir, was

2   that the real meat is when you get into the cart and you see

3   someone spending 800, 1,000, $1,500 in a two-year period of

4   time; right?

5   A.    Individually, yes, but collectively is what makes a

6   big business.

7   Q.    Well, I just want --

8        MR. NEIMAN:  Can you put up page 101 of Mr.

9   Abraham's deposition?

10  Q.    You can see at the top of page 101, sir, you're

11  talking about this topic.

12        Can you see it on the screen, or would you like a

13  hard copy?

14  A.    No, no, I can see -- the screen is actually easier for

15  me to read.

16  Q.    Me, too.

17  A.    Yeah.

18  Q.    Okay.  And you can see that you're talking about

19  ordering patterns and things like that, and then you

20  continue and you say that's interesting, but -- and this is

21  at line six:

22        "The real mean is when you get into the cart and

23  you can see someone spending 800, 1,000, 1,500 -- " --

24  A.    That's not what's on my screen.

25        MR. WEISS:  Your Honor, can we have him read the

555

1    full question and the full answer?

2              THE COURT:  Yes.

3              MR. NEIMAN:  Sure.

4    Q.    Question.  This is at page 100.

5    A.    Yes.

6    Q.    Page 100, question at line 23:

7              "And you consider that to be confidential?

8              "ANSWER:  I'm not sure, just the amount of repeat

9    customers.  I think the confidential part comes in when you

10   look at the ordering patterns and you look at someone buying

11   a trial and then a big, then a three-pack of big, and then

12   you see over a period, you know, because you can have people

13   -- someone order a trial, then another trial -- that's

14   interesting, but the real meat is when you get into the cart

15   and you see someone spending 800, 1,000, $1,500 in a

16   two-year period of time."

17             Did I read that correctly?

18   A.    You read that correctly.

19   Q.    That was your sworn testimony under oath; right?

20   A.    That was my sworn testimony under oath.

21   Q.    Let's just look at the examples so the jury can see

22   one of those examples of a person spending 800, 1,000,

23   $1,500 at one time.

24             If you can look at your big book at DX-634.

25             MR. NEIMAN:  And I would offer Exhibit 664 at this

# EXHIBIT C

242

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW JERSEY

3

4    ABSORPTION PHARMACEUTICALS, LLC, :   Civil No.
                                          17-cv-12872-MCA
5                         Plaintiff,  :

6                 v.                  :
                                           TRANSCRIPT OF
7    RECKITT BENCKISER, LLC, and      :  TRIAL PROCEEDINGS
     DOES 1-50,
8                                     :        VOLUME 2
                          Defendants.
9    --------------------------------x

10   RECKITT BENCKISER, LLC and       :
     RB HEALTH (US) LLC,
11                                    :
             Counterclaim-Plaintiffs, :
12                                    :
                  v.                  :
13                                    :
     ABSORPTION PHARMACEUTICALS, LLC, :
14                                    :
             Counterclaim-Defendants.
15   --------------------------------x

16                                        Newark, New Jersey
                                          May 11, 2022
17

18   BEFORE:

19           THE HON. MADELINE COX ARLEO, U.S.D.J.

20

21                                        Reported by:
                                          CHARLES P. McGUIRE, C.C.R.
22                                        Official Court Reporter

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

243

1    APPEARANCES:

2         WALSH PIZZI O'REILLY FALANGA LLP
          Three Gateway Center
3         100 Mulberry Street
          Newark, New Jersey 07102
4         BY: LIZA M. WALSH, ESQ.
              CHRISTINE I. GANNON, ESQ., and
5             WILLIAM T. WALSH, JR., ESQ.
          And
6         PROSKAUER ROSE LLP
          2029 Century Park East
7         Los Angeles, CA 90067
          BY: JONATHAN M. WEISS, ESQ.
8             COLIN G. CABRAL, ESQ.
              KYLE A. CASAZZA, ESQ.
9             KELLY CURTIS, ESQ., and
              KEISHA-ANN G. GRAY, ESQ.
10        Attorneys for Plaintiff and Counterclaim-Defendant
          Absorption Pharmaceuticals, LLC
11
          McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
12        1300 Mount Kemble Avenue
          Morristown, New Jersey 07962-2075
13        BY: THOMAS R. CURTIN, ESQ.
              JOSEPH P. LaSALA, ESQ., and
14            KATHLEEN N. FENNELLY, ESQ.
          And
15        SHEPPARD MULLIN RICHTER & HAMPTON LLP
          30 Rockefeller Plaza
16        New York, New York 10112
          BY: PAUL W. GARRITY, ESQ.
17            RENA ANDOH, ESQ.
              TYLER E. BAKER, ESQ., and
18            MEGHAN STUER, ESQ.
          And
19        WILMER HALE
          7 World Trade Center
20        250 Greenwich Street
          New York, New York 10007
21        BY: ROBERT J. GUNTHER, JR., ESQ.
              HALLIE B. LEVIN, ESQ.
22            PETER G. NEIMAN, ESQ., and
              PAUL VANDERSLICE, ESQ.
23        Attorneys for Defendants-Counterclaim Plaintiffs
          Reckitt-Benckiser, LLC and RB Health (US) LLC
24

25

441

1    investors.

2    A.    Yes.

3    Q.    At this point in time, who were the largest investors

4    in Absorption?

5    A.    That would be Ron Gilbert's wife, Ellie, and her two

6    sons, so Dr. Gilbert's family; Larry Levine, Greg Kaminski,

7    and myself.

8    Q.    And the letter also mentions your commitment to the

9    founder's family.  What is that a reference to?

10   A.    I was committed to taking care of his family from a

11   financial perspective.  When Ron passed away, he wasn't

12   someone of great means, he was --

13             MR. NEIMAN:  Objection, Your Honor.

14             THE COURT:  Let's stay on topic.

15             So, ask the question again.  Let's narrow it.

16   Q.    I just want to understand, when you mention -- when

17   this letter from Reckitt mentions your commitment to the

18   founder's family, what is that reference that they're making

19   to?

20   A.    That I was committed --

21             THE COURT:  If you know.

22             I mean, it's not a letter he wrote.  The letter

23   speaks for itself.

24             MR. WEISS:  If you know.

25             THE COURT:  Let me stop you, and don't talk over