## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ABSORPTION PHARMACEUTICALS, LLC,<br><br>     Plaintiff,<br><br>     v.<br><br>RECKITT BENCKISER, LLC, and RB HEALTH (US) LLC,<br><br>     Defendants. | Civil Action No. 2:17-cv-12872 (MCA)(JSA) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW

Joseph P. LaSala
Thomas R. Curtin
Kathleen N. Fennelly
MCELROY, DEUTSCH,
MULVANEY & CARPENTER LLP
1300 Mount Kemble Ave.
P.O. Box. 2075
Morristown, New Jersey 07962-2075
(973) 993-8100

Robert J. Gunther Jr.*
Hallie B. Levin*
Peter G. Neiman*
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Paul W. Garrity*
Rena Andoh*
Tyler E. Baker
SHEPPARD MULLIN RICHTER
& HAMPTON LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 653-8700

*Attorneys for Reckitt Benckiser, LLC and RB Health (US) LLC*

*Admitted pro hac vice*

# TABLE OF CONTENTS

I.   RECKITT IS ENTITLED TO JMOL ON ABSORPTION'S FRAUD CLAIM ..................1

    a.   *Absorption has identified no evidence that Reckitt knowingly made any false representations of material facts* ............................3

    b.   *Absorption has not shown any material omission that Reckitt had a duty to disclose* ..................................................7

    c.   *Absorption has not shown detrimental reliance* ...............................9

    d.   *The economic loss doctrine bars Absorption's fraud claim* .........................10

II.  NO JURY COULD AWARD ABSORPTION THE FRAUD DAMAGES IT SEEKS .........11

    a.   *Absorption's expert's damages theories are purely speculative because Absorption gave admittedly false data to Reckitt* ...........................12

    b.   *No damages were proximately caused by the statements and omissions Absorption says were fraudulent* ...............................15

    c.   *Absorption's attempts to deceive Reckitt bar recovery* ...............................16

III. RECKITT IS ENTITLED TO JMOL ON ABSORPTION'S TRADE SECRET MISAPPROPRIATION CLAIMS ...............................................17

    a.   *Absorption has failed to identify any trade secrets with sufficient specificity* ...............................................18

    b.   *The information Absorption claims constitutes trade secrets is oft-disclosed and easily discerned, so cannot be protectable* .................19

    c.   *Absorption's alleged trade secrets did not derive independent economic value from their secrecy* ...............................................24

    d.   *No reasonable jury could conclude that Reckitt improperly used Absorption's trade secrets* ...............................................26

    e.   *Absorption has not proven any other theory of misappropriation* ...............30

IV.  ABSORPTION CANNOT OBTAIN DAMAGES FOR TRADE SECRET MISAPPROPRIATION...............................................32

    a.   *The trade secret damages sought are impermissibly speculative* ................32

    b.   *Absorption has not presented evidence of misappropriation prior to January 21, 2015, but its expert has only offered her opinion on misappropriation before that date* .........................33

    c.   *Absorption has not demonstrated that the form of a reasonable royalty would be a lump sum* .........................33

*d.   Absorption has not shown evidence of actual loss* ........................................36

V.   No Reasonable Jury Could Award Punitive Damages ...........................37

CONCLUSION .....................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.I.A. Holdings, S.A. v. Lehman Bros.*, 2002 WL 1334809 (S.D.N.Y. June 17, 2002)..............................................................................11

*Absorption Pharms., LLC v. Reckitt Benckiser LLC*, 2020 WL 10139487 (D.N.J. June 25, 2020)..........................................27, 31

*AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941 (N.D. Cal. 2003) ...............................................................29

*Agrofresh Inc. v. Essentiv LLC*, 2020 WL 7024867 (D. Del. Nov. 30, 2020)....................................................................................40

*Alexander v. CIGNA Corp.*, 991 F. Supp. 427 (D.N.J. 1998) ...................................5

*Allstate Life Ins. Co. v. Stillwell*, 2020 WL 832898 (D.N.J. Feb. 20, 2020)....................................................................................37

*Allstate New Jersey Ins. Co. v. Lajara,* 117 A.3d 1221 (N.J. 2015) .........................2

*Brooke Group Ltd. v. Brown & Williamson Tobacco*, 509 U.S. 209 (1993)....................................................................................32, 36

*City of Millville v. Rock*, 683 F. Supp. 2d 319 (D.N.J. 2010)...................................7

*Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263 (7th Cir. 1992) ............................................................18, 19

*De Lage Landen Operational Servs., LLC v. Third Pillar Sys., Inc.*, 2010 WL 3431105 (E.D. Pa. Aug. 27, 2010)...............................................27

*DiscoverOrg Data, LLC v. Bitnine Glob., Inc.*, 2020 WL 6562333 (N.D. Cal. Nov. 9, 2020) ........................................33, 40

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) .............................................32

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014)..................34, 36

*Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007) ...........................................7

*GA Telesis, LLC v. Salesforce.com, Inc.*, 2021 WL 5178803 (N.D. Cal. Nov. 8, 2021).........................................................................30

*Gen. Motors LLC v. Ashton*, No. CV 20-12659, 2021 WL 2549498 (D.N.J. June 22, 2021)...............................................................16

*Giallombardo v. Kyriak*, 2021 WL 1847179 (N.J. Super. Ct. App. Div. May 10, 2021).......................................................................39

*Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079 (3d Cir. 1995).................1, 7

*Herley Indus., Inc. v. R Cubed Eng'g*, LLC, 2021 WL 4745230 (E.D. Pa. Oct. 12, 2021) ................................................................31

*Intech Powercore Corp. v. Albert Handtmann Elteka GmbH & Co. KG*, 2021 WL 1138124 (D.N.J. Mar. 24, 2021)....................20, 23

*Jaynes v. Henry*, 2022 WL 326993 (D.N.J. Feb. 3, 2022) ................................10, 11

*Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707 (D.N.J. 2013)........................17

*Katsiavrias v. Cendant Corp.*, 2009 WL 872172 (D.N.J. Mar. 30, 2009) .........................................................................................9

*LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51 (Fed. Cir. 2012) ........................................................................................34

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) ........................6, 8

*LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182 (S.D.N.Y. 2002)........................33

*Lithuanian Com. Corp. v. Sara Lee Hosiery*, 23 F. Supp. 2d 509 (D.N.J. 1998) ...............................................................11, 12

*Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020 (D.N.J. 1995).......................6, 39

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)....................34

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................19

*Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434 (D.N.J. 2002) .........................................................................................3

*Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364 (3d Cir. 2021) ................................18, 19

*Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502 (D.N.J. 2013) ...............32

*Mattel, Inc. v. MGA Ent., Inc.*, 801 F. Supp. 2d 950 (C.D. Cal. 2011) ..................40

*McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750 (3d Cir. 1990)...................16

*McConkey v. AON Corp.*, 804 A.2d 572 (N.J. Super. Ct. App. Div. 2002) ........................................................................................13, 15

*MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159 (Fed. Cir. 2015)................33

*Mondis Tech. Ltd. v. LG Elecs., Inc.*, 2021 WL 4077563 (D.N.J. Sept. 8, 2021) .............................................................................................34

*Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892 (3d Cir. 2021).... 18, 20, 24, 27, 29, 30, 31

*Oshri v. PNC Bank*, No. 17-11594, 2020 WL 1527953 (D.N.J. Mar. 31, 2020) ...........................................................................................2, 9

*Paolicelli v. Wojciechowski*, 333 A.2d 532 (N.J. Super. Ct. App. Div. 1975) ...............................................................................................12

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284 (11th Cir. 2003) ...............................................................................................29

*Pinter v. Dahl*, 486 U.S. 622 (1988) ................................................................16, 17

*Project 74 Allentown, Inc. v. Frost*, 1992 WL 151319 (E.D. Pa. June 22, 1992) ...............................................................................................4

*Proofpoint, Inc. v. Vade Secure, Inc.*, 2021 WL 5407521 (N.D. Cal. Nov. 18, 2021) ......................................................................................39, 40

*Ptaszynski v. Atl. Health Sys., Inc.*, 111 A.3d 111 (N.J. Super. Ct. App. Div. 2015) .............................................................................12

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ................................................22

*Sayegh v. Kalaba*, 2021 WL 2879128 (N.J. Super. Ct. App. Div. July 9, 2021) ............................................................................................39

*SFX Installation, Inc. v. Pimentel*, 2021 WL 4704964 (D.N.J. Oct. 8, 2021) ..............................................................................................23

*Shtutman v. Carr*, 2017 WL 4402045 (N.J. Super. Ct. App. Div. Oct. 4, 2017) ...................................................................................10

*Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*, 226 F. Supp. 3d 828 (W.D. Ky. 2016) ...................................................................29

*Son v. Kim*, 2021 WL 4237241 (D.N.J. Sept. 16, 2021).........................38

*Stanhope v. Bank of Am., N.A.*, 2016 WL 6645770 (D.N.J. Nov. 9, 2016) ...................................................................................38

*Sun Chem. Corp. v. Fike Corp.*, 235 A.3d 145 (N.J. 2020)....................10

*Sunbelt Rentals, Inc. v. Love*, 2021 WL 82370 (D.N.J. Jan. 11, 2021)...................26

*Triffin v. Automatic Data Processing, Inc.*, 926 A.2d 362 (N.J. Super. Ct. App. Div. 2007) .......................................................10

*Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210 (3d Cir. 2002) ................11

*Zeliff v. Sabatino*, 104 A.2d 54 (N.J. 1954) ..........................................15

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ............32

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 1836..................................................................................39, 40

18 U.S.C. § 1839..........................................................................24, 26, 27

Fed. R. Civ. P. 50 ......................................................................................1

N.J. Stat. § 2A:15–5.10...........................................................................38

N.J. Stat. § 2A:15–5.12...........................................................................38

N.J. Stat. § 56:15-2............................................................................26, 27

N.J. Stat. § 56:15-4............................................................................39, 40

## OTHER AUTHORITIES

Restatement (Third) of Unfair Competition § 40 (1995).........................29

Pursuant to Fed. R. Civ. P. 50(a), Defendants Reckitt Benckiser, LLC and RB Health (US) LLC (collectively, "Reckitt") move for judgment as a matter of law ("JMOL") on all issues.  JMOL is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  Said otherwise, "[t]he question is whether, in viewing the evidence in the light most favorable to the [nonmoving] party, no jury could decide in that person's favor."  *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995).  Based on the evidence presented, no reasonable jury could deliver a verdict for Absorption on its fraud or misappropriation claims, nor award Absorption any damages.  The Court should grant Reckitt's motion.[1]

## I.    RECKITT IS ENTITLED TO JMOL ON ABSORPTION'S FRAUD CLAIM

Absorption contends that Reckitt misled the company about its interest in licensing Promescent, including by falsely representing or failing to disclose whether Reckitt was considering developing its own competing product.  The record and law offer no support for that theory of liability.   The record evidence demonstrates Reckitt was interested in striking a deal with Absorption and engaged in good faith negotiations, throughout which Reckitt continually apprised

---

[1]    Reckitt reserves all appellate rights regarding pre-trial and trial rulings, including *Daubert*, summary judgment, and evidentiary rulings.

Absorption of the regulatory and safety hurdles to an agreement.  Reckitt ultimately declined to make an offer to license Promescent after Absorption failed to deliver the safety dossier and clinical trial results that Reckitt had repeatedly requested, and which Absorption knew were crucial to Reckitt's consideration of the Promescent opportunity.  During the course of these arms-length business negotiations, Reckitt had no obligation to discuss with Absorption the unremarkable fact that a company with a strong sexual wellness brand might consider alternatives to licensing Promescent in the event discussions with Absorption did not result in an agreement. Absorption, moreover, suffered no harm from Reckitt's interest in a potential transaction.  It sought and received Reckitt's good-faith participation in negotiations and due diligence, and did not pass up any other opportunities (because it had none). The fact that a deal with Reckitt failed to materialize may have led Mr. Abraham to feel "disappointed and frustrated," Trial Tr. 470 (May 11, 2022) (Abraham), but it cannot sustain a claim for fraud—all along, Mr. Abraham knew that there was "no guarantee," Trial Tr. 729 (May 16, 2022) (Abraham).

Absorption must prove by clear and convincing evidence "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara,* 117 A.3d 1221, 1231 (N.J. 2015); *accord Oshri v. PNC*

*Bank*, 2020 WL 1527953, at *3 (D.N.J. Mar. 31, 2020).  To prevail on a fraud by omission theory, Absorption must further prove that Reckitt had a duty to disclose the omitted material fact.  *See, e.g.*, *Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 461 (D.N.J. 2002).

Absorption cannot meet any element of this test.  No reasonable jury could find a knowingly false representation of material fact, a material omission that Reckitt had a duty to disclose, or reasonable reliance resulting in damages to Absorption.  As a result, JMOL should be granted on Absorption's fraud claim.

   a.   *Absorption has identified no evidence that Reckitt knowingly made any false representations of material facts*

Absorption first contends that various statements about the timeline for a potential deal were materially misleading, but the evidence indisputably shows that each was true when made.  Rather than a guaranteed timeline, Mr. Abraham testified that Reckitt "had a goal" of doing a deal within 30 days and that Mr. Sydow "hoped that he could get it done in 30 days"—timeframes that Mr. Abraham agreed were "aggressive and not probable."  Trial Tr. 674, 676, 691 (May 16, 2022) (Abraham). So too for the extensions of that timeline, which Mr. Abraham acknowledged he understood were necessary for continuing due diligence.  *Id.* at 680, 693, 727.  As Mr. Abraham summarized, Reckitt "had every right to evaluate" Absorption, and although "[t]here were time frames put in place," "there was no guarantee" that Reckitt would move forward with a deal.  *Id.* at 729.

The only actual statements from Reckitt that Absorption has identified were truthful updates about the ongoing, uncertain due diligence process in which Reckitt and Absorption had mutually agreed to engage.  As noted above, Mr. Abraham testified that he understood the process and attendant uncertainties, and explained that Reckitt employees like Mr. Sydow kept him apprised of both the evaluation process more generally and the specific regulatory and safety concerns that might (and ultimately did) scuttle a deal.  *See, e.g.*, Trial Tr. 736-40 (May 16, 2022) (Abraham).  By mid-July 2014, for example, Mr. Abraham was aware that Reckitt had significant concerns about Promescent's regulatory compliance because the product contained ingredients outside of the applicable FDA monograph.  *Id.*; *see also* DX-131.  Indeed, Mr. Abraham testified that he knew non-compliance was "an issue that would have to be addressed" by Absorption, and that Reckitt was "hypersensitive" to such concerns.  Trial Tr. 739, 743 (May 16, 2022) (Abraham).

Throughout the summer and fall of 2014, Mr. Sydow kept Mr. Abraham informed about these issues, Reckitt's concerns, and what Absorption needed to do to move forward.  Trial Tr. 1028 (May 17, 2022); *supra*, at 2.  These truthful updates about the present status of an uncertain process do not, as a matter of law, constitute misrepresentations of fact.  *See, e.g.*, *Project 74 Allentown, Inc. v. Frost*, 1992 WL 151319, at *2 (E.D. Pa. June 22, 1992) (statements that "approval was right around the corner," without proof of intent to deceive, not actionable).

-4-

A claim premised on the identified statements also fails because such representations concerned "future or contingent events," "expectations or probabilities," or "what will or will not be done in the future." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435-36 (D.N.J. 1998). Under New Jersey law, these kinds of assertions "do not constitute misrepresentations, even though they may turn out to be wrong." *Id.* at 435. As explained above, the statements that Absorption relies on speak merely to Reckitt's good faith desire to reach a deal, which the unrebutted testimony of Reckitt's employees makes clear was true throughout the 2014-2015 time period during which the alleged misrepresentations were made. *See, e.g.*, Trial Tr. 1005 (May 17, 2022) (Sydow) (Reckitt was "fascinated by the opportunity" Promescent presented); *id.* at 1007 (Sydow "wanted the concept test to pass" and "did not want to give up"); *id.* at 1008 (Reckitt was "happy that the concept has passed" in December 2014); *id.* at 1009 ("ultimate decision" on whether to proceed with Promescent was not made until January 21, 2015); *id.* (Sydow "was quite disappointed" when Reckitt decided not to license Promescent because he had been "endorsing [a deal] for seven and a half months" and "passionately trying to indeed achieve this deal"). The "predictions of the future" that Absorption has identified from June 2014 to January 2015 were thus "believed when made," and "cannot serve as a basis for a fraud claim just because they subsequently turn out not to be true." *Alexander*, 991 F. Supp. at 435-36.

Absorption responds with the unsupported assertion that Reckitt never *really* intended to strike a deal with Absorption.  To be sure, "where a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud." *Lo Bosco v. Kure Eng'g. Ltd.*, 891 F. Supp. 1020, 1031 (D.N.J. 1995).  But Absorption's theory relies on a promise no reasonable jury could conclude was ever made—that Reckitt *would* enter into a deal to license Promescent from Absorption.  The evidence instead demonstrates that Reckitt told Absorption it would *consider* making a deal, subject to the due diligence that in fact occurred.  *See supra*, at 2-4.  And to prove fraud, "the alleged misrepresentation cannot be predicated simply upon a promise to perform that subsequently is unfulfilled" because "nonperformance does not prove a lack of intent to perform."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1186 (3d Cir. 1993).  There must be some additional evidence of an intent to deceive, and Absorption has offered none.

At trial, Absorption also claimed that Reckitt made affirmative misrepresentations denying that it was developing a competing product. *E.g.*, Trial Tr. 496 (May 12, 2022) (Abraham); Trial Tr. 920 (May 17, 2022) (Abraham).  These vague and conclusory assertions, which do not identify the time or place of the alleged representation, or who made it, and which are uncorroborated by a single contemporaneous document, are legally insufficient to state a fraud claim—much

-6-

less prove one by clear and convincing evidence. *See Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (requiring "precision or some measure of substantiation [for] a fraud allegation"). And in determining whether JMOL is appropriate, courts in this circuit "do not follow the rule that a scintilla of evidence is enough"; the movant need not demonstrate that "there is literally no evidence supporting the unsuccessful party." *Gomez*, 71 F.3d at 1083. The meager submission on these alleged misrepresentations is, at most, a mere "scintilla of evidence," and does not suffice to avoid JMOL.

      b.     *Absorption has not shown any material omission that Reckitt had a duty to disclose*

Absorption also contends that Reckitt defrauded Absorption by failing to disclose between June 2014 and January 2015 that it was considering developing its own PE spray. No reasonable jury could find such an omission fraudulent.

As an initial matter, Reckitt's mere *consideration* of alternative pathways cannot constitute a material omission because Absorption was aware of the possibility that Reckitt would pursue alternatives to licensing Promescent, like in-house development. *See* Trial Tr. 663-64 (May 16, 2022) (Abraham) (testifying he understood Reckitt was "free" to develop its own product); *City of Millville v. Rock*, 683 F. Supp. 2d 319, 333 (D.N.J. 2010) (plaintiff having been "aware" of subject of alleged omission defeats fraud claim). The due diligence process was intensive precisely because of Reckitt's need to weigh the options available, and the evidence

demonstrates that Absorption knew of the uncertainties surrounding Reckitt's interest. *Supra*, at 3-4.  Further, Reckitt had neither decided whether to develop an alternative spray nor taken any step toward doing so until months after Reckitt decided to pass on the Promescent opportunity in January 2015.  As such, there was nothing for Reckitt *to* disclose.

More importantly, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'"  *Lightning Lube, Inc.*, 4 F.3d at 1185.  For good reason, Absorption does not claim that it and Reckitt share a special relationship sufficient to create a duty to disclose.  *Id.* (a "detached business relationship" does not create a relationship giving rise to a duty to disclose an intent to compete). Instead, Absorption contends that disclosure of Reckitt's potential development of its own PE spray was "necessary to make a previous statement true."  The only statements whose truth could be affected by Reckitt's potential development of its own PE spray, however, are the vague assurances that Mr. Abraham testified someone at Reckitt gave him at unspecified times.  Such alleged statements have not been proven by any competent evidence.[2]

---

[2] Mr. De Pretre testified to statements from Mr. Sydow regarding Reckitt's intent to develop a competing delay spray, but those occurred in late 2015.  Trial Tr. 198-99

c.    *Absorption has not shown detrimental reliance*

A fraud plaintiff must demonstrate reasonable reliance on the purported misrepresentation or omission, and resulting damages.  *See Oshri*, 2020 WL 1527953, at *3 (plaintiff failed to prove fraud claim where he "offered no proof that he objectively relied on such a statement" and "cannot show any resulting damages").  Absorption has proven neither by clear and convincing evidence.

From June 2014 to January 2015, Reckitt represented to Absorption that it would engage in due diligence concerning the potential for a transaction.  Reckitt did exactly that—i.e., Reckitt in fact engaged in the due diligence process and considered a potential transaction—and thus Absorption suffered no harm.  *Supra*, at 3-5.  Reckitt also stated during this time that it hoped to be able to reach a deal.  *Supra*, at 3.  Those (true) statements of a general desire to reach a deal caused Absorption no harm because it had no competing offers, and Reckitt did in fact hope and try to reach a deal.  *See, e.g.*, Trial Tr. 701-10 (May 16, 2022) (Abraham) (confirming lying about interest from GSK); Trial Tr. 504 (May 12, 2022) (Abraham) (same, for Auxilium); Trial Tr. 1005 (May 17, 2022) (Sydow) (describing interest in opportunity).  Regardless, such general expressions cannot reasonably be relied on.  *Katsiavrias v. Cendant Corp.*, 2009 WL 872172, at *5

---

(May 10, 2022) (De Pretre).  Absorption has not claimed it relied on any statements by Reckitt, nor suffered any resulting damages, after January 2015.

(D.N.J. Mar. 30, 2009) (no justifiable reliance based on a representation during deal discussions); *Shtutman v. Carr*, 2017 WL 4402045, at *10 (N.J. Super. Ct. App. Div. Oct. 4, 2017) (reliance "on puffery, predictions, or opinions" not justified).

Indeed, Mr. Abraham testified that he understood these were not promises that could be relied on, and were instead expressions of a general aspiration to get a deal done. *Supra*, at 3-4. And after January 2015—when Reckitt clearly stated that it would not license Promescent—Absorption has identified no way in which it relied *at all* on any statement or omission by Reckitt. *See Triffin v. Automatic Data Processing, Inc.*, 926 A.2d 362, 370 (N.J. Super. Ct. App. Div. 2007) (reliance requires "acting or refraining from action" based on a misrepresentation). Moreover, "the finances of Absorption Pharmaceuticals have improved dramatically" since Reckitt's entry into the PE spray market. Trial Tr. 123 (May 10, 2022) (Flyman).

d.   *The economic loss doctrine bars Absorption's fraud claim*

Because the evidence presented at trial demonstrates that Absorption's fraud claim turns on alleged misrepresentations made to Absorption *after* the parties entered into a non-disclosure agreement, it is barred by the economic loss doctrine. That doctrine "prohibits the recovery in a tort action of economic losses arising out of a breach of contract." *Sun Chem. Corp. v. Fike Corp.*, 235 A.3d 145, 150 n.2 (N.J. 2020). As such, "claims of fraud in the performance [of a contract] are barred." *Jaynes v. Henry*, 2022 WL 326993, at *5 (D.N.J. Feb. 3, 2022). In this case, the

fraud Absorption claims occurred involves events occurring exclusively after the parties entered into a non-disclosure agreement, and concerns the question whether Reckitt violated that agreement by developing a competing product using information received under the agreement. When, as here, a fraud claim involves a party's failure to do something "as required by the parties' agreement" and "pertains to the performance of a contract," it is barred by the economic loss doctrine. *Id.*[3]

## II.   NO JURY COULD AWARD ABSORPTION THE FRAUD DAMAGES IT SEEKS

Absorption has not made the showing necessary to send its fraud damages case to the jury. That suffices for JMOL. *Lithuanian Com. Corp. v. Sara Lee Hosiery*, 23 F. Supp. 2d 509, 512 (D.N.J. 1998) (JMOL on New Jersey common law fraud claim when compensatory damages theory could not be sent to jury).[4]

---

[3]   Reckitt argued on summary judgment that the economic loss doctrine barred Absorption's New Jersey trade secret misappropriation claims, *see* Dkt. 211 at 37-38, a contention Reckitt preserves for any eventual appeal. Testimony at trial, however, revealed that the economic loss doctrine *also* bars Absorption's fraud claims for the reasons described here.

[4]   Absorption has abandoned any claim for lost opportunity damages. Regardless, such damages are not available because Absorption presented no evidence that it passed on an opportunity because of an alleged misrepresentation. *See A.I.A. Holdings, S.A. v. Lehman Bros.*, 2002 WL 1334809, at *2-3 (S.D.N.Y. June 17, 2002) (collecting cases holding that lost opportunity damages are not available for fraud claims when a plaintiff "did not pass up other specific opportunities"); *see also Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 220 (3d Cir. 2002) (observing that in securities fraud cases, "'lost opportunity' damages are not available where the fact of the loss, i.e., whether there was any lost opportunity at all, is wholly speculative").

a.    *Absorption's expert's damages theories are purely speculative because Absorption gave admittedly false data to Reckitt*

Under New Jersey law, only "[e]vidence affording a basis for estimating damages with some reasonable degree of certainty is sufficient to support an award of compensatory damages." *Paolicelli v. Wojciechowski*, 333 A.2d 532, 534 (N.J. Super. Ct. App. Div. 1975). When, as here, the jury could not "award compensatory damages without engaging in pure speculation," the Court must grant JMOL. *Lithuanian Com. Corp.*, 23 F. Supp. 2d at 512.

Absorption's theory of fraud damages is that the company was deprived of the "benefit of the bargain" it would have struck in 2014 absent Reckitt's fraud. Trial Tr. 49-50 (May 10, 2022).[5] Absorption contends that the "bargain" the parties would have struck was for an outright purchase of Absorption. Trial Tr. 2160 (May 25, 2022) (Lawton). But as noted above, Absorption has presented no evidence that Reckitt ever represented it would *actually purchase* Absorption, or do anything more than conduct the due diligence that ultimately led to Reckitt declining to proceed.

---

[5]   Throughout this litigation, Absorption has collapsed its fraud and trade secret damages theories, and Ms. Lawton confirmed at trial that her fraud and misappropriation damages calculations are based on the same injury. Trial Tr. 2160 (May 25, 2022). Because Absorption has identified no independent injury arising from the purported fraud, it cannot recover damages for both trade secret misappropriation and fraud. *See Ptaszynski v. Atl. Health Sys., Inc.*, 111 A.3d 111, 120 (N.J. Super. Ct. App. Div. 2015) ("[I]t is fundamental that no matter under what theories liability may be established, there cannot be any duplication of damages.").

*Supra*, at 3-4.  Because Reckitt in fact conducted that due diligence, Absorption received all that was referenced in the allegedly fraudulent statements.  *See, e.g.*, Trial Tr. 532 (May 12, 2022) (Abraham) (noting that the information provided to Reckitt was part of due diligence and denying that there was "anything wrong with them looking at that information to decide whether to do a transaction"); Trial Tr. 729 (May 16, 2022) (Abraham) (testifying that "there was no guarantee" of an acquisition, and that Reckitt "had every right to evaluate [Promescent] and they could decide to move forward or decline").  That suffices to reject damages predicated on a promised acquisition of the company as speculative and unsupported by the evidence.  *Cf. McConkey v. AON Corp.*, 804 A.2d 572, 588 (N.J. Super. Ct. App. Div. 2002) (benefit-of-the-bargain damages permit only "damages equal to that which a plaintiff would have received had the representation been true").

In addition to being premised on a bargain that did not exist, Absorption's fraud damages calculations improperly rely on information fabricated by Mr. Abraham.  To evaluate the "benefit" Absorption would have received in this unconsummated bargain, it relies on the testimony of an expert, Cathy Lawton.  Tr. at 49-50 (May 10, 2022).  Ms. Lawton's damages calculations, in turn, are predicated on her analysis of two "models" circulated within Reckitt in June and August of 2014.  *See* Trial Tr. 2023 (May 24, 2022) (Lawton).  Her $454.5 million fraud damages calculation is based on the June 30, 2014 model, and her alternative $187.9

-13-

million damages calculation is based on an August 20, 2014 model. Trial Tr. 2069, 2085, 2088 (May 24, 2022) (Lawton).

The June model, however, was premised on Mr. Abraham's admittedly false representation that GlaxoSmithKline ("GSK") had estimated a $350 million PE market opportunity, because Reckitt had not done any of own its projections for potential revenue at that point in time. Trial Tr. 699 (May 16, 2022) (Abraham) (admitting having lied about the GSK estimate); Trial Tr. 1510-11 (May 19, 2022) (Stewart) (testimony that the June model depended on the truth of GSK's estimate); DX-941 (describing June model's $500 million estimate of the North American market as being "based on GSK estimate").   Absent Mr. Abraham's false representation, Reckitt's modeling would have been based on "the historic numbers for the actual revenues achieved" along with "a growth rate on that each year going forward," producing a drastically lower projection in light of Absorption's $1.5 million in actual revenue in 2013. Trial Tr. 1510-11 (May 19, 2022) (Stewart).

The August model was also infected with Mr. Abraham's lies. As Mr. Stewart explained, he took "Mr. Abraham at his word that he had competing offers from GSK and Auxilium." Trial Tr. 1483 (May 19, 2022) (Stewart); *id.* at 1491-94 (describing Mr. Abraham's assertions that GSK's and Auxilium's offers were going to expire if Reckitt did not move quickly). The August model was therefore intended "to check that the structure [Reckitt] put in place was superior to the offer[s]" that

-14-

Mr. Abraham told Reckitt "he had already received from GSK and Auxilium." *Id.* at 1532.  Reckitt was "taking his statements about other offers seriously" and that was why they were reflected in the August model. *Id.* at 1533.  Mr. Stewart confirmed that Reckitt "absolutely believed those offers." *Id.* at 1544.

Mr. Abraham admitted at trial, however, that the projections and offers that he told Reckitt he had received were lies. *See, e.g.*, Trial Tr. 701-10 (May 16, 2022) (Abraham) (confirming that Mr. Abraham "made up stuff a lot" when talking to Reckitt, including lying about interest from GSK); Trial Tr. 504 (May 12, 2022) (Abraham) (stating that he was not "exchanging proposals" with Auxilium "during the due diligence process with Reckitt").  Mr. Abraham then directed his investment banker to use those lies as a means to drive up Reckitt's and other's interest in and valuation of Promescent.  Trial Tr. 1921- 32 (Rabin) (describing Mr. Abraham's strategy).  The fact that Reckitt's models were based on Mr. Abraham's falsehoods destroys the foundation of Absorption's damages estimates and renders Ms. Lawton's calculations mere speculation, precluding Absorption's fraud claim from going to the jury. *Zeliff v. Sabatino*, 104 A.2d 54, 56 (N.J. 1954) (for benefit of the bargain damages to be available, plaintiff must establish the benefit "with sufficient certainty"); *McConkey*, 804 A.2d at 588 (same).

        b.     *No damages were proximately caused by the statements and omissions Absorption says were fraudulent*

Even if Absorption had some non-speculative basis to claim damages, JMOL

would still be appropriate because the claimed misrepresentations and omissions did not proximately cause Absorption harm. "In order to establish proximate causation, a plaintiff must show that the defendant's conduct was 'a substantial contributing factor in causing [a] loss.'" *Gen. Motors LLC v. Ashton*, No. CV 20-12659, 2021 WL 2549498, at *8 (D.N.J. June 22, 2021) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 439 (3d Cir. 2007)). Absorption has not done so.

With respect to its fraud claim, Absorption asserts that it was injured by Reckitt's failure to acquire the company. *See, e.g.*, Trial Tr. 654-57 (May 16, 2022) (Abraham). Based on the evidence presented at trial, however, no reasonable jury could conclude that any alleged misrepresentation by Reckitt was a substantial factor in Absorptions' failure to strike a deal between June 2014 and January 2015. Instead, the evidence demonstrated that Absorption had *no* suitors at that time other than Reckitt. Trial Tr. 688-89, 774-75, 836-37 (May 16, 2022) (Abraham). As Mr. Abraham freely and repeatedly admitted, the purported additional opportunities existed only in his imagination. *Id.*; *see also id.* at 695 (interest from one such company was "completely made up"), 703 (same, for another company).

c. *Absorption's attempts to deceive Reckitt bar recovery*

Absorption's recovery is also barred by its own wrongful conduct. *Pinter v. Dahl*, 486 U.S. 622, 632 (1988) ("[A] plaintiff's recovery may be barred by his own wrongful conduct."); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 757 (3d

Cir. 1990) (same under New Jersey law).  As Mr. Abraham's testimony revealed, he repeatedly lied to Reckitt seeking to induce the company into making him an offer. *Supra*, at 1-15; *see generally* Trial Tr. (May 12, 2022) (Abraham); Trial Tr. (May 16, 2022) (Abraham).  His lies were so pervasive that he did not even bother to defend them.  Trial Tr. 691 (May 16, 2022) (stating after giving contradictory testimony, "I—whatever. You know"); *id.* at 837-38 ("Q. So I want to see if I can get this all straight, sir.  You told Reckitt things that weren't true about your discussions with other companies; right?  A. Correct.  Q. You didn't disclose to them the results of the first clinical trial your company conducted; right?  A. Correct.  Q. You sent them a phony document to conceal that, at least in your mind, you might have violated the confidentiality agreement; right?  A. Yes.  Q. And you're claiming it's Reckitt who defrauded you?  A. Yes.").  In such situations, when the "plaintiff has participated 'in some of the same sort of wrongdoing' as the defendant," *Pinter*, 486 U.S. at 632, "a wrongdoer should not profit from his own misconduct," *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 735 (D.N.J. 2013).

## III.   RECKITT IS ENTITLED TO JMOL ON ABSORPTION'S TRADE SECRET MISAPPROPRIATION CLAIMS

For a case purportedly about trade secrets, Absorption has consistently been vague and non-specific about what information it actually believes deserves trade secret protection.  Instead, Absorption has repeatedly invoked broad, generalized categories of "confidential business information," including "sales" and "customer

-17-

data." Trial Tr. 36, 38 (May 10, 2022). That lack of specificity is alone enough to

grant JMOL. *See Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 907 (3d Cir. 2021)

("[C]are must be taken to not allow a plaintiff in a trade secret misappropriation case

to make generalized claims"). But Absorption's failure to identify the information

supposedly at the heart of this case reveals more foundational problems: none of the

information Absorption claims was "misappropriated" was a trade secret, and

nothing Reckitt did constitutes misappropriation within the meaning of the Defend

Trade Secrets Act (DTSA) or New Jersey Trade Secrets Act (NJTSA). *See* Sealed

Trial Tr. 14-15 (May 20, 2022) (Statement of the Court) (noting that confidential

information is not protected under trade secret law and looking at information does

not alone constitute misappropriation).

    *a.*    *Absorption has failed to identify any trade secrets with sufficient specificity*

Absorption's claim first founders because "[w]hen the breadth of a trade

secret description is so far-reaching that it includes publicly available information

… and admitted industry knowledge, that information is not specific enough to be

accorded trade secret status." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 384 (3d

Cir. 2021); *id.* at 384 n.24 (collecting cases). Accordingly, "[i]t is not enough to

point to broad areas of [information] and assert that something there must have been

secret and misappropriated." *Composite Marine Propellers, Inc. v. Van Der Woude*,

962 F.2d 1263, 1266 (7th Cir. 1992). Instead, "[t]he plaintiff must show concrete

secrets." *Id.*  The specificity with which a trade secret must be identified increases with each successive stage of litigation, as with any "matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Here, Absorption's vague allusions to confidential information have been deficient at every turn, and have not met Absorption's burden at trial.  Mr. Abraham, for example, testified as to a number of pieces of purportedly "confidential" information, but then also admitted that each was freely shared without confidentiality agreements, readily ascertained by market participants, or already known by Reckitt.  *See infra*, at 20-23.  Absorption's damages expert's testimony relied on those same defective articulations.  Trial Tr. 2261, 2243-46, 2320-26 (May 25, 2022) (Lawton).  Because Absorption has not offered any additional proof of the particular information it maintains deserves trade secret protection, and instead relies only on broad categories of information that it admits contain information known to or readily ascertained by others, no reasonable jury could find that Reckitt misappropriated a trade secret.  *See Mallet & Co.*, 16 F.4th at 384.

  b.  *The information Absorption claims constitutes trade secrets is oft-disclosed and easily discerned, so cannot be protectable*

Absorption at most appears to contend that so-called "cart data," information about repeat customers, its cost of goods sold (COGS), and two-size and "premium" pricing models constitute trade secrets.  No reasonable jury could find that any of

these categories of information are protectable.[6]

The DTSA and NJTSA both "require[] a plaintiff to demonstrate … the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret." *Oakwood Lab'ys LLC*, 999 F.3d at 905 & n.11.  "In assessing whether information is a trade secret, courts typically consult six factors: (1) knowledge of the information outside the business; (2) knowledge of the information by employees and others in the business; (3) measures taken by the owner to keep the information secret; (4) the value of the information to the business and competitors; (5) the money or effort expended to develop the information; and (6) the ease or difficulty with which others could acquire or duplicate the information by proper means." *Intech Powercore Corp. v. Albert Handtmann Elteka GmbH & Co. KG*, 2021 WL 1138124, at *7 (D.N.J. Mar. 24, 2021).  Because all of these factors weigh against classifying Absorption's information as a trade secret, the Court should grant JMOL.

As a threshold matter, the record demonstrates that Absorption did not take reasonable measures to keep the disputed information secret.  Mr. Abraham testified about how each of the purported trade secrets was shared with other parties not

---

[6]   Absorption also claims selling its product online, and its ratio of online sales, was a trade secret.  But selling "sensitive or embarrassing products online is also a well-known marketing tactic," and Absorption's particular sales mix had no independent economic value to Reckitt.  Trial Tr. 1772, 1793-97 (May 23, 2022) (Erdem).

subject to confidentiality agreements.  For example, he explained that information about "repeat business" was shared in a "nonconfidential meeting" with his blessing. Trial Tr. 573 (May 12, 2022) (Abraham).  He testified that "an order history from a customer" that came "[d]irectly from the cart" was shared with a company to try to attract interest without a confidentiality agreement.  *Id.* at 575-77.  The cart data was shared without a confidentiality agreement too, including details like the number of repeat customers, the quantities and frequency of repeat orders, and the distribution channels through which repeat customers bought product.  *Id.* at 578-79.

This data is at the heart of claimed trade secrets, and Mr. Abraham admitted that the information freely disclosed was "very similar to repeat customer information" that he gave to Reckitt and asserted was confidential.  *Id.*  Mr. Abraham further explained that he shared cart data, including data "show[ing] people buying hundreds of thousands of dollars' worth of [Promescent]," with a potential investor named Andrew Sun even though he was not aware of any confidentiality agreement with Mr. Sun.  *Id.* at 579-81.  Mr. Abraham went so far as to tell a colleague to send Mr. Sun the same presentation containing "repeat business profiles" that he had previously claimed was confidentially sent to Reckitt.  *Id.*

The list of non-confidential disclosures of the supposedly secret data goes on. Absorption liberally shared the allegedly secret repeat customer and cart information—down to individual purchase histories—as part of its standard sales

-21-

pitch to pharmacies without securing confidentiality agreements. *See* Trial Tr. 585-87 (May 12, 2022) (Abraham); *accord id.* at 555-57, 569-70, 577, 587 (describing such information as "the meat" of the cart and insisting, contrary to the evidence, that it would never be shared without a confidentiality agreement). It shared the same information with convenience stores. *See id.* at 590-91. And it sent what Mr. Abraham testified was "the most important facet of the cart"—the repeat customer rate over time—to Target without securing any assurances of confidentiality. Trial Tr. 625-36 (May 16, 2022) (Abraham). These disclosures, individually and collectively, prohibit trade secret protection. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.").

Absorption also claims that offering two sizes and using premium pricing were trade secrets. But that information was readily ascertained from the face of the product and, as Reckitt's marketing expert testified, well-known within the industry and by Reckitt in particular. Trial Tr. 1772, 1789-93 (May 23, 2022) (Erdem). Indeed, after asserting that part of the "secret" at issue in this case was that Absorption's "profit margin was much higher on the big bottle than the small bottles," Mr. Abraham acknowledged that this concept just "makes sense" and can be found in other products. Trial Tr. 645-48 (May 16, 2022) (Abraham); *accord*

Trial Tr. 1793 (May 23, 2022) (Erdem) (this pricing strategy "is not a secret," "[i]t's a well-known practice, and the information's out there even for Promescent" because Absorption is "saying why [it is] doing it").  He also admitted that there were other premium price PE sprays on the market.  Trial Tr. 645 (May 16, 2022) (Abraham).

COGS is also not protectable, because, as Mr. Abraham testified, that number was simply the result of a bidding process involving third parties from whom anyone could request a quote.  Trial Tr. 637-642 (May 16, 2022) (Abraham); Trial Tr. 1797-1800 (May 23, 2022) (Erdem) (COGS can be obtained through asking suppliers).  Because other entities, like Reckitt, could "call up a factory" and obtain the COGS of a PE spray, *id.*, "such information 'was obtainable within normal business channels,'" and cannot constitute a trade secret, *Intech Powercore Corp.*, 2021 WL 1138124, at *7; *accord SFX Installation, Inc. v. Pimentel*, 2021 WL 4704964, at *4 (D.N.J. Oct. 8, 2021) ("general knowledge within the industry" not protectable).[7]

Taken together, all of the purported trade secrets in this case were frequently disclosed by Absorption or readily ascertainable through proper means, precluding

---

[7]  Absorption's particular COGS, moreover, lacked any independent economic value to Reckitt.  Reckitt's marketing expert explained that "there are so many factors that underlie these numbers" that "[u]nless the competitor creates exactly the same thing that costs exactly the same," COGS is "not relevant information."  Trial Tr. 1800 (May 23, 2022) (Erdem).  And as Absorption concedes, K-Y Duration is not "exactly the same thing" as Promescent—to name just two examples, K-Y Duration used a different formula and different (aluminum) packaging, both of which rendered Absorption's COGS of no value to Reckitt.  *See id.* at 1852-53.

-23-

any reasonable jury from finding a violation of the NJTSA or DTSA.

      *c.*     *Absorption's alleged trade secrets did not derive independent economic value from their secrecy*

A trade secret must "derive[] economic value, actual or potential, from not being generally known to, and being readily ascertainable through proper means by, *another person who can obtain economic value from the disclosure or use of the information.*"  *Oakwood Lab'ys*, 999 F.3d at 905 (quoting 18 U.S.C. § 1839(3)).  No reasonable jury could find Absorption carried its burden of proof on this element.

As an initial matter, none of Absorption's purported trade secrets "derive[]" any value from their secrecy because they were not secret.  Absorption was willing to disclose its information freely to others, indicating that it did not believe the value of the claimed trade secrets depended on their secrecy.  Much of the information at issue here was well-known within the industry too, especially to a company like Reckitt with extensive experience in sexual wellness products.  *See, e.g.*, Trial Tr. 1800-05 (May 23, 2022) (Erdem).  As a result, the marketing concepts (like premium pricing and multiple product sizes) that Absorption claims were protected could not have provided a "competitive advantage" over or to a seasoned company like Reckitt.  *See Oakwood Lab'ys*, 999 F.3d at 913.  Indeed, the entire reason that Absorption was seeking to partner with Reckitt was because of the marketing, sales, and distribution knowledge that Reckitt could provide *to Absorption*.  *See, e.g.*, Trial Tr. 648-52 (May 16, 2022) (Abraham) ("access to [Reckitt's] expertise" in these

-24-

areas was what made them "an ideal partner").  The notion that Absorption's take on such concepts was valuable to Reckitt because of its secrecy is thus both implausible and belied by the record.

Absorption also claims that more specific sales and customer information, such as cart data and customer repurchase rate, had independent economic value. Mr. Abraham testified, however, that the value of this information was directly related to the efficacy of *Promescent's* formula.  He said that eutectic formula, including thymol as a key ingredient, was "the guts" of Absorption's product, made it "more effective," and was "the differentiation from the other sprays."  Trial Tr. 616-617 (May 16, 2022) (Abraham); Trial Tr. 552 (May 12, 2022) (Abraham) (formula is "the foundation of the company").  Reckitt's product, in contrast, does not use the Promescent formula.  Trial Tr. 546 (May 12, 2022) (Abraham).

The distinction between the products matters, because Mr. Abraham asserted that the sales and customer information Reckitt allegedly misappropriated is the "very powerful evidence" that *Absorption's* "technology worked."  *Id.* at 552; *id.* at 557.  And Mr. Abraham admitted that he "wouldn't expect to see these same kinds of patterns for a product that didn't work as well as [Promescent]," and acknowledged that the customer data he had would not allow a competitor to "figure out how much somebody would be willing to spend … on a product that didn't have" Absorption's special ingredients.  *Id.* at 557-58.  In other words, it would be of no

value to a company like Reckitt that used a different formulation. Because the value of the information Absorption claims was misappropriated admittedly depends on the value of a technology possessed only by Absorption, such information lacks the *independent* economic value required by the statute.

### d. *No reasonable jury could conclude that Reckitt improperly used Absorption's trade secrets*

Even if Absorption had adequately identified protectable trade secrets, it has not proven that Reckitt knowingly improperly used that information within the meaning of the DTSA or NJTSA. "As a threshold requirement," use "require[s] that the trade secrets were acquired via 'improper means.'" *Sunbelt Rentals, Inc. v. Love*, 2021 WL 82370, at *25 (D.N.J. Jan. 11, 2021) (citing 18 U.S.C. § 1839(5); N.J. Stat. § 56:15-2). Only the use of a trade secret with knowledge that it was acquired by improper means suffices to prove liability. *Id.* That is, misappropriation requires proof of "use of a trade secret of another without express or implied consent by a person who," as relevant here, "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5).[8] If that threshold requirement is met, use further requires demonstrating that Reckitt "took advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to

---

[8]   To the extent Absorption claims any other theory of misappropriation by use is applicable here, such a challenge would fail for the same reasons discussed below—the evidence demonstrates that Reckitt properly acquired trade secrets pursuant to a confidentiality agreement, and used those trade secrets only for permitted purposes.

accomplish a similar exploitative purpose, such as assisting or accelerating research or development." *Oakwood Lab'ys*, 999 F.3d at 910 (alterations omitted).

*First*, Absorption cannot demonstrate that Reckitt knowingly acquired a trade secret "by improper means." 18 U.S.C. § 1839(5); N.J. Stat. § 56:15-2. Improper means include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); *accord* N.J. Stat. § 56:15-2. The statutes also define "proper means," which include "discovery by independent invention, discovery by reverse engineering, discovery under a license from the owner of the trade secret, observation of the information in public use or on public display, obtaining the trade secret from published literature, or discovery or observation by any other means that is not improper." N.J. Stat. § 56:15-2; 18 U.S.C. § 1839(6)(B).

Here, all agree that any of information claimed to be a trade secret was acquired pursuant to the parties' confidentiality agreement. *See, e.g.*, *Absorption Pharms., LLC v. Reckitt Benckiser LLC*, 2020 WL 10139487, at *1 (D.N.J. June 25, 2020). But acquiring trade secrets through a "freely granted contractual agreement" does not constitute misappropriation without a showing that the defendant "violated the terms of the [agreement]." *De Lage Landen Operational Servs., LLC v. Third Pillar Sys., Inc.*, 2010 WL 3431105, at *3 (E.D. Pa. Aug. 27, 2010). No reasonable jury could conclude Reckitt violated the confidentiality agreement, which permitted

Reckitt to use any information Absorption sent to Reckitt to evaluate whether to engage in a transaction with Absorption.  *See* PX-157 at 4 (Confidentiality Agreement).  That is what the evidence demonstrates Reckitt did during the time of Absorption's alleged injury.  *See, e.g.*, Trial Tr. 1021 (May 17, 2022) (Sydow).

*Second*, even setting aside the lack of improper means of acquisition, Absorption has not proven that Reckitt "used" Absorption's trade secrets within the meaning of the applicable statutes.  Absorption has not identified any way in which Reckitt obtained some commercial advantage or value from the Promescent formula.  Instead, Reckitt developed an alternative product using a different recipe because of the potential regulatory problems associated with Promescent's formula.  Trial Tr. 1202 (May 18, 2022) (Sydow); Trial Tr. 1016-19 (May 17, 2022) (Sydow).

Because Reckitt did not use Promescent's patented formulation, the Promescent trademark, or the Promescent packaging, the only way in which Reckitt could have obtained some commercial advantage from Absorption's information was if the sales and marketing data (vaguely) described above conferred such an advantage.  But once more—marketing, distribution, and sales insights were the value that *Reckitt* brought to the table.  *See supra*, at 24-25; *see also* Trial Tr. 1140-43 (May 17, 2022) (Sydow); Trial Tr. 1800-05 (May 23, 2022) (Erdem).

The more specific information that Absorption claims was misappropriated fares no better, and did not make the kind of material contribution to Reckitt's

-28-

product or business necessary to show use. *See, e.g.*, Restatement (Third) of Unfair Competition § 40 (1995) (no use when "the contribution made by the trade secret is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation"); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) (same). For example, the secret "cart data" that Absorption has claimed was so valuable, *e.g.*, Trial Tr. 867-68 (May 16, 2022) (Abraham), was only shown on one occasion to Mr. Sydow for "15 or 20 minutes" on an iPad in a coffee shop, Trial Tr. 544-45 (May 12, 2022) (Abraham). Other than that single occasion, Reckitt lacked the ability to access the information it supposedly used. *See* Trial Tr. 1097 (May 17, 2022) (Sydow); Trial Tr. 926-28 (May 17, 2022) (Abraham) (Reckitt never saw "the totality of the cart"). Nor did Reckitt wish to access the cart, because it contained only "anecdotal consumer data" that was "not useful information." *Id.* Absent some further evidence that Reckitt made use of the allegedly misappropriated data, no reasonable jury could find for Absorption. *See Oakwood Lab'ys*, 999 F.3d at 912 & n.19 ( "access" to trade secret insufficient to show unauthorized use); *Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*, 226 F. Supp. 3d 828, 856 (W.D. Ky. 2016) ("mere possession" not misappropriation); *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 951 n.5 (N.D. Cal. 2003) ("mere possession" is not use or disclosure).

Absorption's contrary theory of use relies on a smattering of internal Reckitt

-29-

documents that contain references or information from Absorption and were circulated after Reckitt declined to license Promescent in January 2015.[9]  *See, e.g.*, DX-305; JX-056; Trial Tr. 1328-42 (May 18, 2022) (Sydow).  But all that this evidence shows is that Reckitt retained *access* to Absorption's information after January 2015.  And mere "access," without more, does not show unauthorized use. *Oakwood Lab'ys*, 999 F.3d at 912 & n.19; *see also GA Telesis, LLC v. Salesforce.com, Inc.*, 2021 WL 5178803, at *1 (N.D. Cal. Nov. 8, 2021) ("'[M]ere possession of a trade secret or mere internal discussion within the company of a trade secret' is not enough to constitute use").  That is because, once more, use requires proof of "exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant." *Oakwood Lab'ys*, 999 F.3d at 909.

      e.    *Absorption has not proven any other theory of misappropriation*

Despite the lack of evidence, Absorption also contends that Reckitt misappropriated trade secrets through improper acquisition or disclosure.  This Court already held any acquisition claim under the DTSA is untimely.  *Absorption*

---

[9]  Absorption cannot rely on use before then because, as noted above, the terms of the parties' agreement permitted Reckitt to use information it had obtained from Absorption to evaluate whether to engage in a transaction.  All of the alleged use prior to January 2015 related to that consideration.  To the extent Absorption claims that Reckitt nevertheless violated the agreement during that earlier time period, such a contention relies on purported assurances about the exclusivity of Reckitt's consideration and collapses into Absorption's fraud case.  That argument fails for the same reason Absorption has not shown Reckitt committed fraud.

*Pharms.*, 2020 WL 10139487, at *7-8.  Absorption has not pressed any independent theory of improper acquisition under the NJTSA, even assuming the statute could support such a claim, *see Oakwood Lab'ys,* 999 F.3d at 908 n.16.   Nor has Absorption articulated an independent theory of improper disclosure—an unsurprising omission given that that Reckitt never disclosed the trade secret outside of the company.  *See Herley Indus., Inc. v. R Cubed Eng'g*, LLC, 2021 WL 4745230, at *5 (E.D. Pa. Oct. 12, 2021) ("a reasonable jury could not find" actionable disclosure on a record "devoid of any evidence of what trade secrets were disclosed, where they were disclosed, or to whom they were disclosed").

If the Court were to nevertheless consider claims based on disclosure or acquisition, they would fail for the same reasons that Absorption's use claim fails. "[L]iability only attaches under these provisions where the trade secret was acquired by improper means in the first instance." *Herley Indus.*, 2021 WL 4745230, at *6. But "the parties do not disagree" that their confidentiality "[a]greement anticipated the[y] would exchange trade secrets and other confidential information during their relationship." *Herley Indus.*, 2021 WL 4745230, at *6.  "Thus, [Absorption] cannot now assert that the trade secrets it shared with [Reckitt] as part of its business relationship were improperly obtained by [Reckitt] at the outset."   *Id.*  Instead, it must rely once more on the theory that Reckitt somehow breached the confidentiality agreement at a later point in time, rendering its initial acquisition of the trade secrets

improper.  That is both at odds with the substantial evidence of Reckitt's genuine interest in evaluating a transaction with Absorption, and contradicted by testimony that Absorption's information was never relied on for other purposes.

## IV.   ABSORPTION CANNOT OBTAIN DAMAGES FOR TRADE SECRET MISAPPROPRIATION

### a.   *The trade secret damages sought are impermissibly speculative*

The Court should grant JMOL on Absorption's trade secret damages theories. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."  *Brooke Group Ltd. v. Brown & Williamson Tobacco*, 509 U.S. 209, 242-43 (1993); *accord Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 529 (D.N.J. 2013) (same).  This concept applies equally to opinions on damages, which "must be based on a sufficient factual foundation." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012) (describing *Elcock v. Kmart Corp.*, 233 F.3d 734, 754 (3d Cir. 2000)).

Ms. Lawton's testimony lacks such a foundation and is contradicted by indisputable record facts, so cannot support an award of damages.  She based her opinions on internal Reckitt models that were created using, or created in response to, information Mr. Abraham now admits he fabricated.  *Supra*, at 12-15.  As explained above, all of her calculations are based on these infected models.  *See supra*, at 13-15.  Without them, her estimates are nothing more than "[c]onclusory

-32-

statements by an expert," which "are insufficient to sustain a jury's verdict." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015).

  b. *Absorption has not presented evidence of misappropriation prior to January 21, 2015, but its expert has only offered her opinion on misappropriation before that date*

  Absorption's theory of misappropriation relies on actions that Reckitt took *after* it decided not to consummate a deal—specifically, that "until early 2016, Reckitt kept going back to the confidential business information that it had obtained from Absorption over and over again," and "continued to use this information." *See, e.g.*, Trial Tr. 37 (May 10, 2022). But Ms. Lawton only offers opinions based on misappropriation occurring before September 2014. Trial Tr. 2188 (May 25, 2022) (Lawton). In fact, Absorption has offered no evidence of what the appropriate damages would be for a misappropriation occurring at some point after January 2015. Without some basis for evaluating the potential damages at the time of the first claimed misappropriation, *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 186 (S.D.N.Y. 2002) (damages measured "at the time that the misappropriation occurred"); *DiscoverOrg Data, LLC v. Bitnine Glob., Inc.*, 2020 WL 6562333, at *9 (N.D. Cal. Nov. 9, 2020) (same), there is no basis for a jury to award damages.

  c. *Absorption has not demonstrated that the form of a reasonable royalty would be a lump sum*

  Ms. Lawton improperly bases her reasonable royalty calculation on the belief that Absorption and Reckitt would have agreed to a lump-sum in a hypothetical

negotiation, Trial Tr. 2112 (May 25, 2022) (Lawton), requiring JMOL.

A hypothetical negotiation "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The transaction reached through the hypothetical negotiation can be in the form of a lump sum or a running royalty. *See id.* at 1325. To choose, an expert must consider the "actual" evidence of the parties' approach to licensing. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012). She must also consider comparable transactions. *Id.* at 80-81. An expert, however, does not have "*carte blanche* to rely on any license he or she believes to be comparable" and instead must make "a showing of baseline comparability." *Mondis Tech. Ltd. v. LG Elecs., Inc.*, 2021 WL 4077563, at *4 (D.N.J. Sept. 8, 2021). Expert testimony that relies on past transactions, moreover, "*must* account for distinguishing facts when invoking a license." *Id.* (emphasis in original); *accord Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (same). A verdict relying on an expert opinion that fails to do so is "arbitrary and speculative" and cannot stand. *LaserDynamics, Inc.*, 694 F.3d at 81 (erroneous comparisons meant "jury's verdict was based on an expert opinion that finds no support in the facts in the record").

Ms. Lawton's opinion that the parties would have agreed to a lump sum is so unmoored from the facts that no jury could rely on it in awarding damages. The

unrebutted record shows that Absorption demanded a running royalty from Reckitt. PX-75 (email from Abraham) ("I have insisted to everyone we have talked to that we must participate in the back end .... I want a mutually beneficial long term relationship."); Trial Tr. 657 (May 16, 2022) (Abraham) (acknowledging lack of any documentary evidence suggesting lump sum payment); *id.* at 658 ("There are a lot of documents where [Abraham] told Reckitt that what [Absorption was] looking for was a revenue stream over time"); DX-203 (email from Abraham) ("the nature of any deal I am asking for" is a "revenue stream over time"); DX-665 (email from Abraham) ("I've been so intent on the revenue stream going forward and not focused on the upfront money"). The financial models created by Reckitt also involved a running royalty. *E.g.*, Trial Tr. 1666 (May 20, 2022) (Stewart) (Reckitt "created royalty payment models for" a potential transaction with Absorption); *id.* at 1672-74 (describing model involving license agreement over time); *id.* at 1711-14 (same).

The only "contrary" evidence presented by Absorption consists of distinguishable transactions and a vague, out-of-context statement from Reckitt's CEO. The latter mentioned "the consideration" that is paid "in connection with an acquisition." Trial Tr. 2122 (May 25, 2022) (Lawton). But that statement simply refers to how Mr. Kapoor considered the total costs of any transaction, including ones involving a running royalty. It says nothing about the form of the transaction considered with Absorption or any other party. The non-comparable transactions

that Ms. Lawton identifies are no more probative. They involve much larger companies with well-established portfolios of products. Trial Tr. 2297-2312 (May 25, 2022) (Lawton). Because Ms. Lawton's analysis fails to account for these distinguishing facts, and improperly discards the evidence of the parties' actual intentions and those agreements that *were* comparable to the potential deal with Absorption, her opinion as to the form of the royalty cannot support an award of damages. *See Ericsson*, 773 F.3d at 1227.

d.   *Absorption has not shown evidence of actual loss*

Absorption's primary damages theory is based on the reasonable royalty that it contends the parties would have agreed to in a hypothetical negotiation. *See* Trial Tr. 2006 (May 24, 2022) (Lawton). But Ms. Lawton also theorizes that the jury could award Absorption damages based on the actual losses it sustained due to Reckitt's purported misappropriation. Trial Tr. 2155 (May 25, 2022) (Lawton). Curiously, her estimate of those actual losses is identical to the result she claims the parties would have reached in a hypothetical negotiation. *Id.* at 2155-59. Because that opinion is unreasonable and contradicted by the evidence, it cannot support damages. *See Brooke Group*, 509 U.S. 209 at 242-43.

What the record actually shows is that Reckitt's entry into the PE market significantly benefited Absorption. As Absorption's current director of operations explained, "[s]ince the launch of K-Y Duration, the finances of Absorption

Pharmaceuticals have improved dramatically."   Trial Tr. 123 (May 10, 2022) (Flymen).  Mr. Abraham also testified to the financial benefits Absorption secured from Reckitt's entry into the PE market.   For many years prior to Reckitt's introduction of K-Y Duration, Absorption had struggled to make any profits.  Trial Tr. 521-28 (May 12, 2022) (Abraham).   Yet after K-Y Duration launched, Absorption's profits steadily began to grow.  *Id.* at 528-29.  Soon the company had "the best year in [its] history," earning "more than the total profits that had ever been earned in the history of the company combined."  *Id.* at 531-32.

Because Absorption cannot show any "actual loss caused by misappropriation"—indeed, it only benefited from the alleged transgressions—no jury could award damages on this theory.  *Allstate Life Ins. Co. v. Stillwell*, 2020 WL 832898, at *4 (D.N.J. Feb. 20, 2020).

## V.        NO REASONABLE JURY COULD AWARD PUNITIVE DAMAGES

Absorption seeks punitive damages for its fraud and trade secret misappropriation claims.  No evidence supports either theory, warranting JMOL.

*First*, Absorption has not shown the willful and malicious behavior necessary for punitive damages under New Jersey common law.  To obtain such damages, Absorption must demonstrate "by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful

disregard of persons who foreseeably might be harmed by those acts or omissions."
*Son v. Kim*, 2021 WL 4237241, at *3 (D.N.J. Sept. 16, 2021) (quoting N.J. Stat.
§ 2A:15–5.12(a)).  "Actual malice" is "an intentional wrongdoing in the sense of an
evil-minded act," and "wanton and willful disregard" is a "deliberate act or omission
with knowledge of a high degree of probability of harm to another and reckless
indifference to the consequences of such act or omission."  N.J. Stat. § 2A:15–5.10.
The jury must also consider "[t]he likelihood, at the relevant time, that serious harm
would arise from the defendant's conduct," "[t]he defendant's awareness of reckless
disregard of the likelihood that the serious harm at issue would arise from the
defendant's conduct," "[t]he conduct of the defendant upon learning that its initial
conduct would likely cause harm," and "[t]he duration of the conduct or any
concealment of it by the defendant."  N.J. Stat. § 2A:15–5.12(b).

None of these considerations weigh in favor of punitive damages, and courts
have rejected such damages for fraud claims involving significantly worse alleged
misconduct.   In "the unfortunate but typical scenario of a trusting individual
exploited and swindled out of a significant amount of money by a con man," for
example, courts have concluded that the defendant's actions did not "rise to the level
of actual malice or wanton and willful disregard necessary to justify an award of
punitive damages."   *Son*, 2021 WL 4237241, at *3.   Cases awarding punitive
damages instead involve far more egregious behavior.   *See, e.g.*, *Stanhope v. Bank*

*of Am., N.A.*, 2016 WL 6645770, at \*5 (D.N.J. Nov. 9, 2016) (parents stole disabled child's accident settlement); *Sayegh v. Kalaba*, 2021 WL 2879128, at \*1, \*4 (N.J. Super. Ct. App. Div. July 9, 2021) (defendant secretly sold close friend's property after other thefts, kept proceeds, and ignored his lawyer's advice to cease fraud).  As New Jersey courts have explained, "[a]lthough 'every fraud is reprehensible, not every fraud warrants punitive damages.'"  *Giallombardo v. Kyriak*, 2021 WL 1847179, at \*4 (N.J. Super. Ct. App. Div. May 10, 2021) (alterations omitted); *Lo Bosco*, 891 F. Supp. at 1034 ("Fraud, standing alone, without some additional aggravating element, will not sustain a claim for punitive damages.").

*Second*, Absorption has not made the necessary showing for punitive damages under the DTSA and NJTSA.  Both statutes require proof of willful and malicious misappropriation.  *See* 18 U.S.C. § 1836(b)(3)(C); N.J. Stat. § 56:15-4.  To determine whether punitive damages are warranted, courts consider "the degree of reprehensibility associated with the wrongdoer's actions, the duration of misappropriative conduct, the defendant's consciousness of resulting injury and any efforts to cover up malfeasance, the need to deter similar misconduct in the future, the amount of compensatory damages awarded, and the wealth of the particular defendant." *Proofpoint, Inc. v. Vade Secure, Inc.*, 2021 WL 5407521, at \*2 (N.D. Cal. Nov. 18, 2021) (collecting cases).

Absorption has presented no evidence of any heightened degree of culpability,

-39-

consciousness of injury (an unsurprising deficiency given that Absorption has shown no injury at all), nor efforts to "cover up" any misconduct.  This case instead more closely resembles a dispute between competitors in which the defendant was "pursuing a legitimate business interest."  *Agrofresh Inc. v. Essentiv LLC*, 2020 WL 7024867, at *26 (D. Del. Nov. 30, 2020).  Here there is no evidence of the type of conduct that has supported punitive damages awards.  *See, e.g.*, *DiscoverOrg Data, LLC*, 2020 WL 6562333, at *10 (defendant stole credentials for database, with heightened need for deterrence given likelihood future use would go undetected).[10]

## CONCLUSION

For these reasons, the Court should grant Reckitt's motion.

---

[10]  If the Court concludes JMOL is not appropriate on Absorption's requests for trade secret misappropriation punitive damages, it should nevertheless send to the jury only the question *whether* such damages are warranted.  The Court, not the jury, must decide the amount of any such damages.  *See* 18 U.S.C. § 1836(b)(3)(C) ("a *court* may . . . award exemplary damages" (emphasis added)); N.J. Stat. § 56:15-4(b) ("the *court* may award punitive damages" (emphasis added)); *accord Agrofresh Inc.*, 2020 WL 7024867, at *23 ("in cases of willful and malicious misappropriation, the Court may award additional exemplary damages" and "[w]hether to award exemplary damages is committed to the Court's discretion"); *Proofpoint, Inc.*, 2021 WL 5407521, at *1 ("Under [the] DTSA, 'a court may' award" exemplary damages after a jury verdict); *Mattel, Inc. v. MGA Ent., Inc.*, 801 F. Supp. 2d 950, 952 (C.D. Cal. 2011) (holding that under a law, like the NJTSA, that is modeled on the Uniform Trade Secrets Act, "[t]hough the existence of willful and malicious misappropriation is ordinarily considered a fact that a jury must find by clear and convincing evidence, the court calculates the amount of exemplary damages").

Dated:  May 27, 2022

Robert J. Gunther, Jr.*
Hallie B. Levin*
Peter G. Neiman*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007

*Admitted pro hac vice

/s/ Thomas R. Curtin

Thomas R. Curtin
Joseph P. LaSala
Kathleen N. Fennelly
MCELROY, DEUTSCH, MULVANEY
  & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
Telephone:  973.993.8100
Facsimile:  973.425.0161
tcurtin@mdmc-law.com
jlasala@mdmc-law.com
kfennelly@mdmc-law.com

Paul W. Garrity*
Rena Andoh*
Tyler E. Baker
SHEPPARD MULLIN RICHTER
  & HAMPTON LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: 212.653.8700

Attorneys for Reckitt Benckiser, LLC and
RB Health (US), LLC

-41-